UNITED STATES of America, acting By and Through the WESTERN AREA POWER ADMINISTRATION, Plaintiff,

v.

PACIFIC GAS AND ELECTRIC COMPANY, Northern California Power Agency, and the Cities of Alameda, Healdsburg, Lodi, Lompoc, Ukiah, and Santa Clara, Defendants.

And Related Cross–Actions.

No. C–88–1600–WWS.

United States District Court,
N.D. California.

June 8, 1989.

C. Max Vassanelli, Peter Kim, Jr., Dept. of Justice, Civ. Div., Washington, D.C., for plaintiff.

Terry J. Houlihan, McCutchen, Doyle, Brown & Enersen, San Francisco, Cal., Richard W. Nichols, McDonough, Holland & Allen, Sacramento, Cal., Robert C. McDiarmid, Spiegel & McDiarmid, G. Philip Nowak, Arnold & Porter, Washington, D.C., for defendants.

## MEMORANDUM OF DECISION AND ORDER

SCHWARZER, District Judge.

The United States, through the Western Area Power Administration ("WAPA"), brings this action against Pacific Gas and Electric Company ("PG & E"), Northern California Power Agency ("NCPA"), and six city members of NCPA ("Cities")[1] to recover payment for energy[2] sold by WAPA and used by the Cities from May through September 1982, and to resolve disputes between WAPA and PG & E over capacity furnished by WAPA to PG & E. PG & E, NCPA, and the Cities assert various counterclaims and cross-claims. Sacramento Municipal Utility District ("SMUD") intervened by leave of Court.

Before the Court are the parties' cross-motions for summary judgment and partial summary judgment and SMUD's motion to dismiss two of PG & E's claims. The Court has considered the briefs and other papers filed on these motions and the arguments of counsel based on a previous version of this Order which was furnished to the parties for their comment. There being no material issues of disputed fact, judgment will be entered as stated below.

---

1. The Cities of Alameda, Healdsburg, Lodi, Lompoc, Santa Clara, and Ukiah.

2. "Energy" is an amount of electricity generated over time. "Capacity" is the amount of electricity that a system is capable of generating at any given time. The term "power" includes both energy and capacity.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. *Surplus Northwest Energy Sales*

During the spring and summer, hydro-electric facilities in the Pacific Northwest generate more energy than that region can use. WAPA typically imports some of this surplus energy for use by California consumers who otherwise would require more expensive electricity generated by PG & E from fossil fuels. Prior to 1982, WAPA sold surplus Northwest energy to PG & E which, in turn, sold it to its customers, including the Cities. On May 28, 1982, WAPA contracted to sell some of that energy directly to NCPA on behalf of the Cities ("May 28 Agreement"). From May through September 1982, Northwest surplus energy was delivered over the PG & E system to the Cities.[3]

NCPA sought to secure an agreement with PG & E for transmission of this energy. PG & E refused to enter into such an agreement, claiming that WAPA was acting beyond its statutory authority and in breach of Contract 14–06–200–2948A ("Contract 2948A"). PG & E contended that Contract 2948A obligated WAPA to sell the energy to PG & E, rather than to the Cities. (Sipple Dec. filed 7/1/88, Exs. 8, 12, 14.[4]) PG & E suggested that, pending resolution of this dispute, WAPA bill PG & E under Contract 2948A and that the Cities pay PG & E under the terms of their contracts with PG & E. (*Id.*, Exs. 12, 15.) Instead, the Cities established an escrow account into which they deposited the payments for this energy.[5] (*Id.*, Ex. 16.) PG & E and the Cities issued joint escrow instructions to the bank holding these funds. (PG & E Ex. 1002.) The validity of this sale and the disposition of those funds is in dispute here.

By this ruling, the Court resolves the legal issues raised by the parties' motions as more specifically described in section II, below. Resolution of those issues defines the legal relations among the parties during the periods at issue. Various extraneous points have been raised by the parties that appear calculated to confuse the Court rather than advance the decision. For example, in its post-hearing letter, PG & E argues that there is a factual issue concerning "how much energy Healdsburg, Lompoc and Santa Clara could actually have purchased."[6] But that "issue" is immaterial to the questions before the Court, which concern the contractual rights of the Cities to obtain power from sources other than PG & E. If accounting issues remain, those are for the parties to resolve in conformity with their contractual relations.

Another such point is PG & E's attempt to avoid its obligations by hiding behind the

---

**3.** At oral argument PG & E contended that the surplus Northwest energy was not physically delivered to the Cities. (Tr. 6–7, 20–21.) Even if true, this is irrelevant. This energy passed through the PG & E system along with energy from other sources, and it is neither feasible nor practical to trace energy from any source once it is fed into that system. The result is that the energy used by any consumer is a mix of all of the various sources of energy fed into the system. Only for bookkeeping purposes is energy treated as though it can be traced from where it enters the system to the ultimate end user. *See City of Santa Clara v. Andrus*, 572 F.2d 660, 669 (9th Cir.1978).

**4.** Citations to source materials follow these conventions: exhibits to individual declarations are identified by the name of the declarant and the date on which the declaration was filed; numbered exhibits are identified by number—exhibit numbers beginning with 1 are by PG & E, and exhibit numbers beginning with 3 are by NCPA and the Cities; exhibits attached to the various requests for judicial notice are identified as follows: "RJN"—Request for Judicial Notice filed by NCPA and the Cities on 7/1/88; "Supp. RJN"—Supplemental Request for Judicial Notice filed by NCPA and the Cities on 11/10/88; "2d Supp. RJN"—Second Supplemental Request for Judicial Notice filed by NCPA and the Cities on 2/13/89; "3d Supp. RJN"—Third Supplemental Request for Judicial Notice filed by NCPA and the Cities on 5/23/89; and the Transcript of Proceedings of 5/19/89 is abbreviated "Tr."

**5.** Santa Clara paid $3.5 million directly to PG & E and $4.8 million into the escrow account.

**6.** PG & E has offered evidence to show that the surplus Northwest energy available on some days from May through September 1982 was less than the total demand of these three Cities. (*See* 2d Conner Dec. filed 5/19/89.) On those days, Healdsburg, Lompoc, and Santa Clara purchased sufficient energy from PG & E to meet their demands.

filed rate doctrine, which has nothing to do with the legal issues before the Court. (*See infra* section III.A.5.) This decision relieves no party of legal obligations that it has under rates filed with the Federal Energy Regulatory Commission ("FERC") or of the duty to comply with FERC's regulatory requirements applicable to the transactions that are the subject of this decision.

### B. *Contract 2948A*

Contract 2948A, entered into by WAPA and PG & E in 1967, integrates the power supply facilities of WAPA's Central Valley Project ("CVP"), PG & E, and additional Northwest entities that may be under contract to CVP from time to time. Under the Contract, CVP and PG & E coordinate their electrical systems to maximize their capacity to meet their combined load requirements.

Power generation by CVP facilities varies seasonally according to rainfall and snowmelt. CVP alone could supply firm service,[7] so-called "unsupported firm" service, only at the lowest dependable capacity level of the annual cycle. By selling power in peak months and buying power in shallow months, CVP is able to provide firm service at, essentially, the annualized average capacity under the driest possible conditions, the so-called Project Dependable Capacity ("PDC"). (*See* Supp. RJN, Ex. 30, Contract 2948A, Art. 9(i) (definition of PDC).) Because firm service is more valuable than non-firm service, CVP generates more revenue by smoothing its power sales in this manner.

In Contract 2948A, the parties worked out an exchange arrangement that allows CVP to do this. When CVP's generation exceeds its load, it deposits the excess into energy and capacity "bank accounts" with PG & E, and when load exceeds generation, CVP withdraws energy and capacity from these accounts or, if the accounts are emp-

ty, PG & E sells energy and capacity to CVP to meet its load.[8]

Other provisions of the Contract entitle PG & E, in some circumstances, to purchase power from CVP that is in excess of CVP's loads. PG & E contends that these provisions entitled it to purchase the surplus Northwest energy that is the subject of this dispute.

### C. *The Stanislaus Commitments*

Many of the issues in the motions before the Court turn on the meaning of the so-called Stanislaus Commitments.

In the early 1970's the Antitrust Division of the Department of Justice ("DOJ") investigated allegations of various anticompetitive acts by PG & E. The Commitments are contained in an agreement entered into between PG & E and DOJ on April 30, 1976, under which PG & E agreed to accept the Commitments as conditions attached to its Diablo Canyon nuclear power license in exchange for the DOJ dropping its antitrust investigation. 41 Fed. Reg. 20225 (1976).

The Commitments generally describe PG & E's obligations to provide, among other things, interconnection, transmission, and power service.

### D. *Procedural Background*

The United States filed this action in April 1988. In Count I of the second amended complaint, the United States seeks payment either from NCPA and the Cities or from PG & E for the surplus Northwest energy that it supplied and the Cities used in 1982. The other three claims are directed only at PG & E. Count II is for payment for excess capacity supplied from May through September 1982 by WAPA to PG & E from CVP in excess of PDC. Count III is for payment under an alleged oral contract between WAPA and PG & E to supply firm capacity to PG & E from May through September 1982. In

---

**7.** Capacity is "firm" if the utility supplying it guarantees that the user will always be able to draw on it. It is more expensive than "excess" capacity, which may not be available to the user if demand from other users is too high.

**8.** This exchange arrangement benefits PG & E as well because its peak load time is in the summer, at the same time that CVP's generation is at its highest level.

Count IV the United States seeks a declaration that PG & E is obligated to give it credit for imported Northwest capacity starting in May 1988.

At the same time as it filed this action, the United States filed another action before FERC against PG & E, NCPA, and the Cities, seeking payment for the Northwest energy imported by WAPA from May through September 1982. (FERC No. EL88–22–000; *see* RJN, Ex. 17, Complaint before FERC.)

PG & E filed various counterclaims and cross-claims. The first, second, and sixth claims arise out of the dispute over Northwest energy imported by WAPA from May through September 1982: the first and sixth claims are against WAPA and the Cities, respectively, for breach of contract; and the second claim seeks a declaration that WAPA is not statutorily authorized to broker Northwest energy. The third claim is for payment for firm capacity allegedly sold by PG & E to WAPA in the May–September 1982 period. The fourth and fifth claims relate to PG & E's ongoing dispute with WAPA about the level of PDC of the Central Valley Project: claim four asks the Court to set PDC for the future, and claim five requests payment of sums that PG & E claims are due to it for past capacity transactions.

NCPA and the Cities filed a counterclaim and cross-claim seeking a declaration that WAPA was authorized to and did sell the energy directly to the Cities in 1982. NCPA and the Cities also filed an interpleader claim relating to the escrow account.

The Court gave leave to SMUD to intervene pursuant to Federal Rule of Civil Procedure 24(a) on the ground that any determination of PDC for CVP will affect the rates that it pays for energy. SMUD asks the Court not to set the level of PDC.

## II. MOTIONS BEFORE THE COURT

The motions before the Court fall into five distinct groups: (1) motions relating to the surplus Northwest energy imported by WAPA from May through September 1982; (2) motions relating to WAPA's and PG & E's obligations to each other for capacity sales from May through September 1982; (3) motions relating to PG & E's obligations to give WAPA credit for imported Northwest capacity starting in May 1988; (4) motions relating to PG & E's claim that WAPA owes PG & E money for capacity transactions during 1980–87; and (5) motions relating to PG & E's request that the Court set the long term level of PDC.

With respect to the surplus Northwest energy, PG & E moves the Court for partial summary judgment that (1) Contract 2948A obligated WAPA to sell that energy to PG & E (PG & E claim one); (2) WAPA did not have the statutory authority to sell this energy to the Cities (PG & E claim two); (3) PG & E was not obligated to transmit this energy (NCPA claim one); (4) the Cities' contracts with PG & E obligated them to purchase from PG & E the energy they used from May through September 1982 (PG & E claim six); and (5) the surplus Northwest energy imported by WAPA from May through September 1982 was sold by WAPA to PG & E and, in turn, by PG & E to the Cities who now are obligated to pay PG & E for it (various claims). WAPA, NCPA, and the Cities move for partial summary judgment that (1) WAPA had the statutory authority to sell surplus Northwest energy to the Cities from May through September 1982 (PG & E claim two); (2) Contract 2948A did not obligate WAPA to sell that energy to PG & E (PG & E claim one); (3) the Cities were entitled, under their contracts with PG & E, to purchase energy from sources other than PG & E (PG & E claim six; NCPA claim one); and (4) PG & E was obligated to transmit the energy to the Cities (NCPA claim one).

PG & E also moves for partial summary judgment that WAPA is obligated to pay PG & E for firm capacity furnished by PG & E to WAPA from May through September 1982 (PG & E claim three). WAPA moves for partial summary judgment that PG & E is obligated to pay WAPA for excess capacity (WAPA claim II) and firm capacity (WAPA claim III) furnished by

WAPA to PG & E from May through September 1982.

PG & E also moves for partial summary judgment that it is not required to give WAPA credit for imported Northwest capacity starting in May 1988 because WAPA did not give the required notice. WAPA moves for partial summary judgment that it gave PG & E the required notice. (WAPA claim IV.)

PG & E and WAPA also move for summary adjudication determining whether WAPA is obligated to pay PG & E for capacity sold by PG & E to WAPA during 1980–87 at rates calculated according to Contract 2948A or, instead, at the lower rates at which PG & E originally billed WAPA, allegedly by mistake. (PG & E claim five.)

Finally, PG & E moves for a declaration that the long term value of PDC under Contract 2948A is 554 MW until the parties agree otherwise. WAPA moves for partial summary judgment that Contract 2948A bars such a declaration. SMUD moves to dismiss PG & E's claim. (PG & E claim four.)

## III. DISCUSSION

### A. *WAPA's Sale of Surplus Northwest Energy to the Cities*

On May 28, 1982 WAPA entered into an agreement with NCPA to sell surplus Northwest energy to the Cities. PG & E attacks the validity of the May 28 Agreement on a number of grounds and contends that WAPA was obligated to sell the energy to PG & E, that the Cities could purchase energy only from PG & E, and that PG & E is therefore entitled to be paid for all energy used by the Cities. PG & E further contends that, even if the May 28 Agreement was otherwise valid, the filed rate doctrine precludes enforcement of the Agreement because there is no rate on file with FERC specifically covering the proposed transaction.

The validity of the May 28 Agreement depends on whether (1) WAPA had the statutory authority to make such a sale; (2) WAPA was able, consistent with the terms of Contract 2948A, to sell surplus Northwest energy to parties other than PG & E; (3) PG & E was obligated to transmit that energy; and (4) the Cities were able, consistent with the terms of their contracts with PG & E, to purchase energy from parties other than PG & E. These issues are addressed in WAPA's Count I, in PG & E's first, second, and sixth claims, and in NCPA's first claim.

### 1. WAPA's Statutory Authority

The Department of Energy ("DOE") exercises the power marketing and transmission functions formerly performed by the Bureau of Reclamation. 42 U.S.C. § 7152(a)(1)(E). WAPA is a division of DOE, created pursuant to 42 U.S.C. section 7152(a)(3), to which was delegated the responsibility for marketing federal power in the western United States.

The authority of DOE to market energy derives from several statutes. Section 2 of the Rivers and Harbors Act of 1937, which created CVP states:

> That the entire Central Valley Project ... is ... declared to be for [specified purposes], and for the generation and sale of electric energy as a means of financially aiding and assisting such undertakings and in order to permit the full utilization of the works constructed to accomplish the aforesaid purposes.

50 Stat. 850; *see* 16 U.S.C. § 695d. The statute further authorizes the Secretary of Energy to enter into all "necessary contracts" for these purposes. *Id.* Although this sale did not relate directly to the operations of CVP, the revenues that it generated help pay for CVP (Anderson 2d Dec. filed 4/19/89 ¶ 4), and therefore aid CVP, albeit indirectly.

Moreover, under Section 14 of the Reclamation Act, the Secretary has authority in connection with federally-owned projects "to enter into such contracts for exchange or replacement of ... electric energy ... as in his judgment are necessary and in the best interests of the United States and the project." 43 U.S.C. § 389. Section 9(c) of that act, although not explicitly granting authority for the sale of energy, does so

implicitly by establishing the conditions governing such sales. 43 U.S.C. § 485h(c).

Finally, under 16 United States Code section 825s, the Secretary is authorized to market surplus federal energy. The energy in question is surplus from the Bonneville Power Authority ("BPA"), another division of the DOE.[9]

PG & E's argument is that these statutes do not authorize what it calls "brokering" but it provides no reasoned basis for this contention. Apparently its theory is that, although the Secretary has certain limited authority to sell energy for limited purposes, WAPA is not authorized "to purchase power from a third party for the purpose of reselling it to a different third party." (PG & E Opp. 17.) Even if this argument were relevant, it distorts the facts because the surplus Northwest energy that is the subject of this dispute was purchased by WAPA from BPA. PG & E does not contend that the Secretary was not authorized to sell this energy through BPA. To contend that another division of DOE, to which the Secretary has delegated his authority to market energy, cannot sell the same energy is absurd.

In any event, in the face of such a broad Congressional grant to the Secretary of Energy and his delegee of authority to make energy sales, it verges on the frivolous to contend that WAPA had statutory authority to sell surplus Northwest energy from BPA to PG & E but not to the Cities. PG & E's other arguments on this point have been considered and found to be so lacking in merit as not to warrant further discussion.

### 2. WAPA's Obligations Under Contract 2948A

■ PG & E contends that, under Contract 2948A, WAPA may import surplus Northwest energy only for use by PG & E unless PG & E agrees to the transaction. PG & E points to no language in Contract 2948A giving it the exclusive right to purchase Northwest energy from WAPA. It seeks to arrive at that result by tortuous and obscure reasoning to the effect that a new agreement must be negotiated before WAPA can sell this energy to anyone else. PG & E cites Articles 19(e), 12(a)(6), 19(g), and 22(a)(2) of Contract 2948A in support of its position.

#### a. *Article 19(e)*

PG & E bases its argument primarily on Article 19(e) which provides that

> [WAPA] may import for use or sale in [PG & E]'s Service Area such Northwest Dump and Exchange Energy ... as can be used beneficially by [PG & E] in [PG & E]'s Service Area ..., as determined by [PG & E]. [PG & E] shall accept all such energy.

(Supp. RJN, Ex. 30, Contract 2948A.) PG & E contends that this article limits WAPA's authority to import surplus Northwest energy to that which can be used beneficially by PG & E, and that WAPA may not import surplus Northwest energy for the benefit of others.

That contention is inconsistent, however, with the language of Article 19(e) and with PG & E's prior interpretation of that article. Article 19(e) does not say that WAPA may not import surplus energy for use by others than PG & E. To protect against the possibility of such an interpretation, the Cities, in proceedings before FERC, objected to Articles 19(d)–(f) as anticompetitive and asked that they be modified. In response to that objection, PG & E represented to FERC that

> Articles 19(d)–(f) do not say what the Cities claim they do. They merely obligate PGandE to bank power which can be used beneficially in its service area. That fact doesn't preclude [WAPA] from importing power and selling it to someone other than PGandE.

(2d Supp. RJN, Ex. 3001, PG & E's Second Post–Hearing Brief at 189, *Pacific Gas*

---

**9.** PG & E suggests in its reply brief that the energy may not have been generated on federal facilities because "BPA acts as a clearinghouse both for energy generated in the Pacific Northwest by private entities *and* for federally gener- ated power." (PG & E Reply 1.) However, PG & E has come forward with no facts to show that the disputed energy was not generated on BPA facilities.

*and Elec. Co.,* Nos. E–7777(II) and E–7796 (FERC Apr. 12, 1982).)

The Administrative Law Judge who presided over that proceeding concurred, stating that "[n]othing in Contract 2948A should be allowed to restrain [WAPA] from importing and using or selling elsewhere energy not sold to PG & E." *Pacific Power & Light Co.,* 26 FERC ¶ 63,048 at 65,223 (1984) (exceptions pending).

An interpretation of Article 19(e) under which PG & E's consent is required before WAPA may sell energy to a third party would contradict these statements and render them meaningless.

### b. *Article 12(a)(6)*

PG & E contends that Article 12(a)(6) applies if the disputed energy was energy associated with capacity.[10] (PG & E Reply 1.) The evidence establishes, however, that the energy sold to NCPA was non-firm surplus energy not associated with capacity. BPA billed WAPA for this energy as surplus energy at its rate for energy without a capacity component.[11] (*See* Anderson Dec. filed by WAPA on 4/3/89, Exs., BPA bills to WAPA; Waldon Dec. filed by PG & E on 2/14/89 at ¶¶ 4, 5; *see also* PG & E Reply 1 ("PG & E understood that all or almost all of the energy was non-firm energy without capacity."); NCPA and Cities Opp. 26 (energy imported was not associated with capacity).) Therefore, Article 12(a)(6) does not apply.[12]

### c. *Article 19(g)*

PG & E also relies on Article 19(g) but does not explain how WAPA's acts were in breach of that article. That article provides:

> If any ... energy supplied from a source or by means of transmission capability other than as specified in this Article is to be obtained by [WAPA] for use or sale in [PG & E]'s Service Area, such source or transmission means shall not be connected to [PG & E]'s system ... except pursuant to an agreement to be negotiated covering the terms and conditions of such connection.

(Supp. RJN, Ex. 30, Contract 2948A.) NCPA and the Cities concede that this provision applies to the disputed energy, and that an interconnection agreement was necessary for the transaction. (NCPA Opposition 27.) However, under the Stanislaus Commitments,

> [PG & E] shall not unreasonably refuse to interconnect and operate normally in parallel with a Neighboring Entity.

41 Fed.Reg. 20225, 20226 ¶ II(A) (1976).[13]

Because WAPA is a Neighboring Entity (*see* 2d Supp. RJN, Ex. 3007, PG & E Answer at ¶ 23, *Western Area Power Admin. v. Pacific Gas & Elec. Co.,* No. EL88–22–000 (FERC 1988)), PG & E under this provision is obligated to enter into an interconnection agreement with it on request if the request is reasonable. Moreover, WAPA is already interconnected with PG & E and, as PG & E represented to the Nuclear Regulatory Commission ("NRC"),

> if you were talking about someone [such as WAPA] ... with whom PG & E is already interconnected, forget about [the

---

10. Alternatively, PG & E argues, if the energy is treated as non-firm energy without capacity, then Article 19(e) applies. (PG & E Reply 1.)

11. PG & E argues that WAPA is entitled to transmit only 400 MW over the Pacific Intertie and that WAPA claims to have imported 400 MW of capacity over the Intertie from May through September 1982. Therefore, it contends, any energy imported by WAPA during this period must have been associated with capacity. (PG & E Reply Memo. 19.) The record shows, however, that BPA billed WAPA separately for capacity, for energy associated with capacity, and for surplus energy, and that it did in fact bill for surplus energy. (Exhibits to Anderson Dec. filed by WAPA 4/3/89.)

12. At oral argument PG & E contended that, apart from Article 12(a)(6) and other provisions of Contract 2948A, it had a right to purchase *all* surplus Northwest energy imported by WAPA from May through September 1982 because, pursuant to an oral agreement with WAPA, it was also purchasing 400 MW of Northwest capacity imported by WAPA during that period (*see infra* section III.B.2). (Tr. 36–40.) But PG & E has come forward with no support for its unilateral assertion that purchase of capacity confers a right to purchase surplus energy not associated with that capacity.

13. PG & E's contention that the Court may not enforce the Stanislaus Commitments is discussed and rejected in section III.A.3, below.

commitment to enter into interconnection agreements]. They are already interconnected, so there isn't any question about whether PG & E is going to refuse to interconnect or not.

(2d Supp. RJN, Ex. 3004, *In the Matter of Pacific Gas and Elec. Co. (Stanislaus Nuclear Project, Unit 1),* No. P564A at 2106 (NRC Jan. 23, 1979).) WAPA, therefore, did not violate Article 19(g).

### d. *Article 22(a)(2)*

At oral argument PG & E contended for the first time that Article 22(a)(2) gave it the right to purchase all surplus Northwest energy delivered to it by WAPA. (Tr. 12–16.) Article 22(a)(2) provides that

The energy sold by [WAPA] to [PG & E] in any month shall be the total energy delivered to [PG & E] in that month by or for [WAPA] under this contract minus the total energy delivered by [PG & E] to [WAPA] in that month under this contract.

(Supp. RJN, Ex. 30, Contract 2948A.) BPA delivered the surplus Northwest energy to PG & E's Tracy Substation on behalf of WAPA for transmission to the Cities. (*See* Anderson Dec. filed 4/3/89 ¶ 1.) PG & E contends that the only contract under which it accepts delivery at Tracy on behalf of WAPA is Contract 2948A and that, therefore, the surplus Northwest energy was "energy delivered to [PG & E] by or for [WAPA] ... under this contract."

PG & E's argument distorts the contract language. Article 22 plainly does not give PG & E any independent right to purchase energy from WAPA. It is labelled "Charges and Payments" (Supp. RJN, Ex. 30, Contract 2948A), and is simply an accounting provision specifying a formula to compute the amount of energy for which PG & E must pay WAPA. As indicated by the language "under this contract," PG & E's rights and obligations to purchase energy from WAPA are defined in other articles.

Even if Article 22(a)(2) meant what PG & E says it does, there is no evidence that the surplus Northwest energy was delivered to PG & E under Contract 2948A. There is

only counsel's unsupported statement that the energy must have been delivered under Contract 2948A because PG & E has not entered into any other contract covering deliveries at Tracy. But that is precisely what this dispute is about: whether WAPA could sell directly to the Cities instead of proceeding under Contract 2948A.

Accordingly, the contention that Contract 2948A precluded WAPA's sale to the Cities, either categorically or in the absence of a further agreement with PG & E, must be rejected.

### 3. PG & E's Obligation to Provide Transmission Services

■ The surplus Northwest energy could not reach the Cities except by transmission over PG & E facilities. PG & E contends that, because it never agreed to transmit the energy, the Cities never received any surplus Northwest energy from WAPA. WAPA, NCPA, and the Cities contend that PG & E's entry into a further agreement was not a precondition to PG & E's obligation under the Stanislaus Commitments to provide transmission services.

The Commitments provide that

[PG & E] shall transmit power pursuant to interconnection agreements, with provisions which are appropriate to the requested transaction and which are consistent with these license conditions. . . . [S]uch service shall be provided ... (2) between a Neighboring Entity with which ... it is interconnected and one or more Neighboring Distribution Systems with which ... it is interconnected and (3) between any Neighboring Entity ... and [PG & E]'s point of direct interconnection with any other electric system engaging in bulk power supply outside the area then electrically served at retail by [PG & E].

41 Fed.Reg. 20225, 20227 ¶ VII (1976).

It is not disputed that WAPA and NCPA are Neighboring Entities and that the Cities are Neighboring Distribution Systems within the meaning of the Commitments. (*See* 2d Supp. RJN, Ex. 3007, PG & E Answer at ¶ 23, *Western Area Power Admin. v. Pacific Gas & Elec. Co.,* No. EL88–22–000 (FERC 1988).) Nor is it dis-

puted that PG & E is interconnected with these Entities and Distribution Systems. (*See* 2d Supp. RJN, Ex. 3004, *In the Matter of Pacific Gas and Elec. Co. (Stanislaus Nuclear Project, Unit 1)*, No. P564A, at 2106 (NRC Jan. 23, 1979) (representation by counsel for PG & E).)

PG & E has repeatedly acknowledged its obligation to provide transmission services under these Commitments. To FERC it represented in a brief filed in January 1982 that

> The Stanislaus Commitments provide *legally binding assurance* of [PG & E's cooperation with NCPA]. The Commitments require PGandE to provide a range of transmission and other coordination services.... [They] provide transmission and coordination services generally to any utility whose principal operations are in northern and central California.

(2d Supp. RJN, Ex. 3005, PG & E's First Post–Hearing Brief at 33–35, *Pacific Gas and Elec. Co.*, Nos. E–7777(II) and E–7796 (FERC Jan. 8, 1982) (emphasis added).) In proceedings before the NRC in 1979, its counsel represented

> [I]n general there is a commitment made by the company to provide transmission services.
>
> * * * * * *
>
> [T]here is no provision in the transmission section that says we will provide these transmission services when it is reasonable to do so. It says we will provide these transmission services.
>
> * * * * * *
>
> [T]he general scheme is that the commitments require PG & E to provide the transmission services.
>
> * * * * * *
>
> The commitments ... impos[e] on PG & E an obligation to transmit.

(2d Supp. RJN, Ex. 3004, *In the Matter of Pacific Gas and Elec. Co. (Stanislaus Nuclear Project, Unit 1)*, No. P564A, at 2068, 2105, 2082, 2084 (NRC Jan. 23, 1979).) The precise issue presented in this case was raised before the NRC:

> Chairman Miller: What happens if both PG & E and another neighboring entity wish to purchase the same power?
>
> Mr. Houlihan [for PG & E]: Under that circumstance, the neighboring entity selling the power would have the option to sell it to whoever it wanted to sell it to, because we have a commitment to transmit power from a neighboring entity to another neighboring entity.

(*Id.* at 2142.)

In conformity with these statements, PG & E on two occasions in 1982 agreed to transmit energy for entities entitled to service under the Stanislaus Commitments without insisting on prior negotiation of a transmission agreement. Retroactive agreements covering these transactions were filed by PG & E with FERC one year later. (*See* Sipple Dec. filed 7/1/88, Exs. 2–4 (letters relating to transactions); RJN, Exs. 9–12 (retroactive filings).)

When PG & E was notified by NCPA of the instant transaction, however, it refused to provide transmission services on the ground that the transaction violated Contract 2948A. (Sipple Dec. filed 7/1/88, Exs. 7, 8.) PG & E now contends that because it "refused to provide transmission service to NCPA for the Northwest surplus energy it sought to deliver to the Cities ... [and] never agreed to other arrangements" (PG & E Opp. 2–3), the Cities could not purchase the energy from WAPA, but instead had to purchase it from PG & E. Putting aside the other issue arising under the Stanislaus Commitments concerning the Cities' obligations under their contracts with PG & E, which is discussed in the next section, the argument advanced by PG & E is, in substance, that the Stanislaus Commitments are nothing but empty words having no force in the absence of a further agreement providing for the specific transmission service. In effect, PG & E's position is that the conditions to which it agreed in order to overcome antitrust objections reserve to it the power to veto any transmission requests simply by refusing to enter into such an agreement. PG & E's current position flies in the face of common sense and squarely contradicts the repre-

sentations that it has made repeatedly to induce the NRC and FERC to grant it valuable rights over strong objections. To accept that position would be to rob those words of their meaning.[14]

Transmission services must of course be consistent with applicable requirements and conditions. The Commitments provide that "[PG & E] shall not be required ... to provide transmission service if the proposed transaction would be inconsistent with Good Utility Practice." 41 Fed.Reg. 20225, 20227 ¶ VII (1976). But when PG & E refused to provide transmission service in 1982, it did not base its refusal on the ground that to do so would be inconsistent with Good Utility Practice[15] or would violate any other relevant condition. To the contrary, when NCPA requested transmission services, PG & E responded that "we have little difficulty reaching sensible transmission service arrangements." (Sipple Dec. filed 7/1/88, Ex. 8, letter from PG & E to NCPA.)

Furthermore, PG & E's position is contrary to what appears to have been its past course of dealing. Because time is of the essence in energy transactions, transmission services have on at least two prior occasions been rendered when needed and the terms worked out afterward. (See RJN, Exs. 9–12 (retroactive rate filings).)

That was the approach taken in connection with the May 28, 1982 Agreement as well when PG & E and the Cities jointly set up an escrow account to hold the Cities' payments for the energy that they received until this dispute is resolved. (See PG & E Ex. 1002.)

Accordingly, PG & E was obligated under the Stanislaus Commitments to transmit the Northwest energy sold by WAPA to the Cities when requested in 1982. Once PG & E files an appropriate rate with FERC, NCPA and the Cities, in turn, are obligated to pay PG & E the reasonable value of these transmission services.

■ PG & E also contends that, even if it violated the Stanislaus Commitments, this Court is without jurisdiction to enforce them in this action. According to PG & E, because the Commitments are NRC license conditions, under sections 221 and 234 of the Atomic Energy Act ("AEA"), 42 U.S.C. §§ 2271 and 2282, they can be enforced only by the United States Attorney General after advising the NRC.[16]

PG & E's supporting analogy to consent decrees is peculiarly ill-chosen. See Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 750, 95 S.Ct. 1917, 1932, 44 L.Ed.2d 539 (1975). In a brief filed with

**14.** How PG & E's argument robs words of their meaning is illustrated by the interpretation it gave at oral argument to language in a brief that it had filed in the District of Columbia Circuit. In the brief PG & E said that "the Stanislaus Commitments are a statement of general principles by which PGandE *has agreed to abide in negotiating contracts with other electric utilities*" in California for interconnection and transmission services. (PG & E unnumbered Ex. appended to Second Conner Dec. filed 5/19/89, PG & E's Opening Brief at 22, *Pacific Gas and Elec. Co. v. FERC,* Nos. 79–1882 and 80–2192 (D.C.Cir.1982) (emphasis added).) At oral argument it said that this referred only to PG & E's agreement with the DOJ to accept license conditions but that "there's no separate contract in which the company agreed to abide by them." (Tr. 32.)

**15.** Not until oral argument did PG & E contend that transmission would have violated Good Utility Practice. It argued that Good Utility Practice does not require it (1) to participate in what it considers to be an unlawful transaction, (2) to allow its customers to breach their existing contracts, or (3) to act in a way that does

not consider the economic interests of its customers. (Tr. 29–30.) PG & E's interpretation of "Good Utility Practice" is so broad that it would virtually nullify the Commitments. In any event, its argument is without merit. First, as discussed in section III.A.1, above, this transaction was not unlawful. Second, as discussed in section III.A.4, below, the Cities of Healdsburg, Lompoc, and Santa Clara were not in breach of their contracts. And third, PG & E does not say how the economic interests of its customers are affected by the transaction between WAPA and the Cities except that PG & E lost the opportunity to purchase the cheap Northwest surplus power. Moreover, PG & E previously agreed that loss of business to a competitor does not affect determination of whether something is consistent with Good Utility Practice. (NCPA Ex. 3009, Letter from PG & E to NRC.)

**16.** This action, though not pleaded as one to enforce the Commitments, is brought by the Attorney General who would be the proper person to bring such an action.

FERC on April 12, 1982, in support of its claim that the Stanislaus Commitments "preclude a finding that PG & E has monopoly power," PG & E quoted the following language from *Broadcast Music, Inc. v. CBS, Inc.*, 441 U.S. 1, 13, 99 S.Ct. 1551, 1559, 60 L.Ed.2d 1 (1979):

> Of course, a consent judgment, even one entered at the behest of the Antitrust Division, does not immunize the defendant from liability for actions, including those contemplated by the decree, that violate the rights of nonparties.

(3d Supp. RJN, Ex. 3010, PG & E's Second Post–Hearing Brief at 40–41, *Pacific Gas and Elec. Co.*, Nos. E–7777(II) and E–7796 (FERC Apr. 12, 1982).) Far from urging that the Commitments were not enforceable except by the Justice Department, PG & E there said:

> The Stanislaus Commitments provide assurance that transmission and coordination services will generally be available to any utility whose principal operations are in northern and central California.

(*Id.* at 46.)

This is not an action, moreover, to enforce the AEA. In addition to being NRC license conditions, the Stanislaus Commitments are part of a contract between PG & E and the Department of Justice under which the DOJ dropped its antitrust investigation of PG & E in return for PG & E's agreement to include the Commitments as part of its Diablo Canyon license. *See* 41 Fed.Reg. 20226 (1976). WAPA, NCPA, and the Cities are entitled to sue as third-party beneficiaries of that contract to enforce their rights under that contract. Where, as here, there is no question as to the liability of the United States as the contracting party, a third-party beneficiary claim may be based on that contract if California law permits it. *Miree v. DeKalb County*, 433 U.S. 25, 31, 97 S.Ct. 2490, 2494, 53 L.Ed.2d 557 (1977).

California law allows a third-party beneficiary claim to be brought by a direct beneficiary of a contract between a private party and the government. *Martinez v. Socoma Companies, Inc.*, 11 Cal.3d 394, 401–02, 113 Cal.Rptr. 585, 590, 521 P.2d 841, 846 (1974) (contract between defendant and Secretary of Labor to hire and train members of specific class of persons gives rise to third-party beneficiary claim by class members); *Zigas v. Superior Court*, 120 Cal.App.3d 827, 174 Cal.Rptr. 806 (1981) (contract between defendant landlord and HUD for benefit of tenants gives rise to third-party beneficiary claim by tenants), *cert. denied*, 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 655 (1982). The Stanislaus Commitments were made expressly for the benefit of the Neighboring Entities and Distribution Systems in PG & E's service area. WAPA and NCPA are Neighboring Entities and the Cities are Neighboring Distribution Systems. They have standing to assert a third-party beneficiary claim in this Court under the Commitments.

### 4. Cities' Obligations Under Contracts With PG & E

PG & E contends that the contracts in effect between it and the Cities between May and September 1982 obligated the Cities to purchase all of their energy requirements from PG & E, and that the Cities therefore must pay PG & E for all energy delivered to them during that period.

Each of the contracts between the Cities and PG & E in effect during this period was entered in 1981 or 1983 (with retroactive effect) and specified that

> PGandE shall sell and deliver to [the City], and [the City] shall purchase and receive from PGandE all Power required by [the City]....

(RJN, Ex. 19, Ex. A, Healdsburg contract ¶ 1(a); NCPA and Cities Ex. 3011, Alameda contract ¶ 7; NCPA and Cities Ex. 3012, Lodi contract ¶ 1; RJN, Ex. 25, Ex. A, Lompoc contract ¶ 1(a); RJN, Ex. 26, Ex. B, Santa Clara contract ¶ 11; NCPA and Cities Ex. 3013, Ukiah contract ¶ 7.)

NCPA and the Cities contend that, under the Stanislaus Commitments, PG & E is obligated to provide not only firm but also partial requirements service. The Commitments provide in relevant part:

Upon request, [PG & E] shall offer to sell firm, full or partial requirements power for a specified period to an interconnected Neighboring Entity or Neighboring Distribution System under a contract with reasonable terms and conditions including provisions which permit [PG & E] to recover its costs.

41 Fed.Reg. 20225, 20227, ¶ VI (1976).

The issue presented is whether the Stanislaus Commitments allow the Cities unilaterally to terminate or modify full requirements contracts with PG & E made after the Commitments took effect.[17] Though NCPA and Cities claim the right to do so under the Commitments, they have come forward with no supporting evidence or argument. They contend only that the Commitments require PG & E to enter into interconnection agreements on demand, which is irrelevant. (See NCPA and Cities Reply 2–7.)

On previous occasions when the Cities have negotiated to obtain energy from sources other than PG & E, PG & E has not insisted on compliance with the full requirements provision. (See Sipple Dec. filed 7/1/88, Exs. 2–4 (letters relating to transactions).) In 1981, PG & E agreed to amend its contracts with each of the Cities to create an explicit exception to the full requirements provision for Northwest energy delivered under another transmission agreement between NCPA and PG & E.[18]

(See RJN, Ex. 19, Ex. A, Healdsburg contract ¶ 1(a); RJN, Ex. 23, Ex. F, Alameda contract ¶ 7; RJN, Ex. 24, Ex. B, Lodi contract ¶ 1; RJN, Ex. 25, Ex. B, Lompoc contract ¶ 1(a); RJN, Ex. 26, Ex. B, Santa Clara contract ¶ 11; RJN, Ex. 27, Ex. C, Ukiah contract ¶ 7.) This course of dealing, however, does not alter the terms of the contracts entered into by the Cities in 1981 and 1983, long after the Stanislaus Commitments took effect. Had they wanted to, the Cities at that time could have insisted on their right to enter into contracts for partial requirements service. They did not do so (except as discussed in the following paragraph). The Commitments specifically contemplate that sales would be "under a contract," implying an exchange of obligations. To the extent that the Cities obligated themselves to take their full requirements from PG & E in exchange for PG & E's obligation to supply them, they cannot look to the Stanislaus Commitments for an escape clause.[19]

The contracts of three of the Cities, Healdsburg, Lompoc, and Santa Clara, did contain alternate power clauses. The Healdsburg and Lompoc contracts provided:

(b) Nothing in this Agreement shall be interpreted in such a way as to prevent [the City] from seeking to obtain Power from sources other than PGandE....

---

17. At oral argument, NCPA and the Cities contended that their contracts with PG & E were not full requirements contracts. (Tr. 59–64.) Each of the contracts did provide exceptions to the full requirements provision for specific energy. However, but for these specific exceptions, which do not apply, all of the contracts were for the Cities' full energy requirements.

NCPA and the Cities also contended that the full requirements provisions in the contracts of Alameda and Ukiah were entered into in 1955 and the full requirements provision of the contract of Lodi was entered into in 1970, prior to the Stanislaus Commitments. (Tr. 59.) However, each of these contracts was amended subsequent to the Commitments, and each amendment specifically included the full requirements provision.

18. NCPA and the Cities concede that this exception does not apply to this case. (NCPA and Cities Reply 7.)

19. The contracts entered into between PG & E and the Cities of Alameda, Lodi, and Ukiah in 1983 with retroactive effect to 1981 each contained a reservation of rights clause providing that

Nothing contained herein shall be construed as affecting in any way the rights or positions of the parties with respect to matters in dispute, including specifically the delivery of Northwest energy during the period May 1–September 30, 1982 pursuant to the Western/NCPA contract dated May 28, 1982. (3d Supp. RJN, Ex. 3011, Alameda contract, ¶ 6; 3d Supp. RJN, Ex. 3012, Lodi contract, ¶ 6; 3d Supp. RJN, Ex. 3013, Ukiah contact, ¶ 6.)

However, this reservation of rights does not create any right that those Cities did not already have under their prior contracts with PG & E. Because each of these three Cities entered into a full requirements contract with PG & E in 1981, after the Commitments took effect, the reservation of rights is irrelevant.

(c) In the event [that the City] is able to obtain ... Power from sources other than PGandE and still wishes to continue purchasing some Power from PGandE, at [the City]'s request the Parties shall endeavor in good faith to amend, supplement or supersede this Agreement in order to accommodate [the City]'s purchase and use of such other sources of Power on terms and conditions which are just and reasonable.

(RJN, Ex. 19, Ex. A, Healdsburg contract ¶¶ 1(b)–(c); RJN, Ex. 25, Ex. A, Lompoc contract ¶¶ 1(b)–(c).) PG & E's contract with Santa Clara had a similar provision. (RJN, Ex. 26, Ex. A, Santa Clara contract ¶ 12.)

These provisions apply to the Cities' purchase of surplus Northwest energy in 1982. PG & E contends that the Cities could not bring a new energy source on line until they and PG & E had negotiated amendments. When NCPA informed PG & E of the Cities' intent to purchase that energy, PG & E was obligated to enter into good faith negotiations to amend the agreements with Healdsburg, Lompoc, and Santa Clara to accommodate that purchase. Instead PG & E responded with a letter that simply declared that the transaction would be unlawful. In material part that letter read as follows:

As you have indicated, the transactions contemplated in your letter are premised on Western's use of Intertie capacity, which is governed by existing contracts. In that regard, PGandE does not believe that Western's attempt to use Intertie capacity to implement such transaction [sic] can take place without a breach of contract on Western's part.

While we have little difficulty reaching sensible transmission service arrangements, it is quite clear that the Stanislaus Commitments, whose definitions you referenced, contain no obligation to enter arrangements that will interfere with this Company's use of the Intertie for our customers' benefit under existing contractual arrangements. If we have misunderstood your premises, please advise us promptly as to just how these transactions are to be structured without eliciting a breach of Western's Intertie contract in a manner detrimental to PGandE and its customers.

(Sipple Dec. filed 7/1/88, Ex. 8.)

PG & E does not contend that it ever offered or was willing to negotiate terms permitting these three Cities to purchase alternate energy. Had it been willing to do so, little would have been required to accommodate the transaction; aside from transmission arrangements, only a routine adjustment in billing was needed. (*See* PG & E Opening Memo. 6 (disputed transaction did not involve any operating change for PG & E).) Instead it argued that the contracts entitled it to bar the Cities from invoking the alternate power clause simply on the strength of a "good faith belief in the position it took, that it was not under the circumstances obligated to provide these services." (Tr. 8–9.) But here, as elsewhere, words seem to lose their meaning in PG & E's arguments. The Court is unable to follow the reasoning by which an obligation to "endeavor in good faith ... to accommodate" is converted into a right to reject categorically a request on the strength of a "good faith belief."

PG & E's failure to comply with the contractual obligation to negotiate in good faith precludes it from objecting to the invocation of the alternate power clauses by these three Cities.[20]

### 5. The Filed Rate Doctrine

■ In its briefs and at oral argument PG & E contended that under the filed rate doctrine, even if the May 28 Agreement is valid, PG & E is still entitled to payment from the Cities for the energy that they used because the only contracts filed with FERC for energy used by the Cities are the contracts between the Cities and PG & E.

---

**20.** At oral argument PG & E contended that whether PG & E negotiated in good faith is a factual question inappropriate for summary judgment. However, given PG & E's flat refusal to negotiate at all, no reasonable jury could find that PG & E fulfilled its obligation to negotiate in good faith. Therefore, summary judgment is appropriate. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

PG & E's attempt to hide behind the filed rate doctrine to avoid its plain obligations under the Stanislaus Commitments and its contracts with the Cities is without merit. The Court addresses this irrelevant issue in detail only because PG & E has pressed it so persistently.

PG & E contends that under the filed rate doctrine no sale or transmission of energy can take place unless a rate covering that transaction is filed with FERC prior to the transaction. Because the sale of surplus Northwest energy from WAPA to the Cities would require PG & E to provide transmission, capacity, and emergency reserve services, PG & E contends that that sale could not be consummated until rates were filed with FERC for those services. And because no such rates were filed, PG & E contends that no energy was sold under the May 28 Agreement. The only rates filed with FERC covering energy used by the Cities were the contracts between PG & E and the Cities. PG & E contends that, therefore, the energy used by the Cities must have been furnished under those contracts by PG & E.

PG & E's contentions, however, are based on an incorrect interpretation of the scope of the Court's order and of the filed rate doctrine.

The filed rate doctrine provides that a public utility, such as PG & E, may not collect a rate for transmission or sale other than one filed with FERC. *See Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571, 577, 101 S.Ct. 2925, 2930, 69 L.Ed.2d 856 (1981) ("*Arkla*"); 16 U.S.C. § 824d. This Court does not have the authority to impose a different rate than the rate filed. *Arkla*, 453 U.S. at 578, 101 S.Ct. at 2930.

The filed rate doctrine, however, does not oust this Court of jurisdiction to interpret contracts and construe statutes to the extent that such action is not rate setting. *See Arkla*, 453 U.S. at 579, 101 S.Ct. at 2931.. Thus, the Court may hold that WAPA has the statutory authority to sell the surplus Northwest energy, that the May 28 Agreement does not violate Contract 2948A, that PG & E is required under the Stanislaus Commitments to provide the

necessary transmission services, and that the Cities of Healdsburg, Lompoc, and Santa Clara may purchase energy from WAPA.

PG & E interprets these rulings as ordering it to depart from established rates and contends that, therefore, these rulings violate the filed rate doctrine. However, PG & E ignores the fact that it was WAPA, not PG & E, that sold the surplus Northwest energy to the Cities of Healdsburg, Lompoc, and Santa Clara. The filed rate doctrine is not implicated by the Court's holding that PG & E is not entitled to collect payment under its contracts with these Cities for energy that PG & E did not sell to them. This holding has nothing to do with collection of payment for transmission or sale under rates not filed with the FERC, which is the focus of the filed rate doctrine.

PG & E is correct that a necessary corollary to the Court's holdings is that PG & E provided transmission, capacity, and emergency reserve services that are not covered by rates currently filed with FERC. Under the filed rate doctrine, the Court may not set rates for these services. Therefore, if PG & E wishes to collect payment for these services, it must file rates with FERC. Although FERC does not have the power to impose a retroactive rate revision, *Arkla*, 453 U.S. at 578, 101 S.Ct. at 2930, it may *allow* a rate revision to have retroactive effect if good cause is shown. 16 U.S.C. § 824d(d); *see also Arkla*, 453 U.S. at 578 n. 8, 101 S.Ct. at 2930 n. 8. FERC ordinarily finds good cause and allows retroactive filings on agreement of the parties. *See City of Girard v. FERC*, 790 F.2d 919, 924–25 (D.C.Cir.1986). At oral argument, NCPA and the Cities agreed to support PG & E's filing of rates for such services. (Tr. 72–73.)

## 6. Conclusion

Accordingly, the motions of WAPA, NCPA, and the Cities of Healdsburg, Lompoc, and Santa Clara for partial summary judgment with respect to Count I of the complaint and the related counterclaims and cross-claims will be granted on all issues respecting the purchase by or on be-

half of those Cities of surplus Northwest energy from WAPA from May through September 1982. The motions of the Cities of Alameda, Lodi, and Ukiah are denied for the reason that they were obligated to purchase all of their energy requirements from PG & E.

The motion of PG & E is denied except as hereafter stated. PG & E is (1) obligated, according to Articles 19(e) and 22(b) of Contract 2948A, to pay WAPA for the surplus Northwest energy imported by WAPA that was not used by the Cities of Healdsburg, Lompoc, and Santa Clara; (2) entitled to be paid by the Cities of Alameda, Lodi, and Ukiah, according to their contracts with PG & E, for all energy used by them from May through September 1982; and (3) entitled to be paid by the Cities of Healdsburg, Lompoc, and Santa Clara for transmission, capacity, and emergency reserve services provided by PG & E and for the energy used by those Cities in excess of the surplus Northwest energy which they used, in accordance with rate schedules to be filed with and approved by FERC. PG & E is, of course, entitled to be paid by the Cities of Healdsburg, Lompoc, and Santa Clara for the energy that it supplied to those Cities on days when the surplus Northwest energy available was less than those Cities consumed. In addition, PG & E must return to Santa Clara the $3.5 million that Santa Clara paid to it, plus interest.

### B. *Capacity Sales Between WAPA and PG & E From May through September 1982*

WAPA and PG & E have two disputes relating to capacity sales from May through September 1982: (1) whether PG & E is obligated to pay WAPA for capacity supplied by WAPA to PG & E in excess of PDC (WAPA's Count II); and (2) whether (a) WAPA supplied to PG & E 400 MW of firm capacity pursuant to an oral agreement and Table 1 of Contract 2948A [21] (WAPA's Count III) or (b) PG & E supplied capacity to WAPA pursuant to Article 20(e)(1) [22] of Contract 2948A (PG & E's third claim). WAPA and PG & E both move for partial summary judgment with respect to the first dispute. PG & E moves for partial summary judgment with respect to the second dispute; WAPA contends that factual disputes exist precluding partial summary judgment with respect to this dispute.

### 1. Capacity Supplied by WAPA in Excess of PDC

There is no dispute that WAPA furnished capacity to PG & E in excess of PDC from May through September 1982. On May 2, 1986 WAPA and PG & E entered into a letter agreement in which PG & E acknowledged that it owed WAPA for this capacity. (Second Amended Complaint, Ex. E, Letter Agreement between WAPA and PG & E.) PG & E contends, however, that under the terms of that agreement it is not required to make payment until the other disputes relating to the 1982 period—principally the disputes involving the energy sale to the Cities—are resolved. All of those disputes are before the Court in this action and will be resolved when it is terminated.

Accordingly, WAPA's motion for partial summary judgment on Count II is granted, and the final judgment in this action shall provide that PG & E shall pay to WAPA pursuant to the May 2, 1986 agreement $4,881,401.44 plus interest from that date.

### 2. Firm Capacity Transactions in 1982

■ PG & E contends that it supplied capacity to WAPA pursuant to Contract 2948A, which obligates PG & E to make available to WAPA capacity whenever CVP lacks sufficient PDC plus other firm capacity from the Northwest to meet the demand

---

21. Table 1 is appended to Article 12(a)(5) of Contract 2948A.

22. Article 20(e) applies to WAPA shortfalls in capacity only prior to January 1, 1975. (Supp. RJN, Ex. 30, Contract 2948A, Art. 20(e)(1).) Therefore it does not apply to this dispute over alleged WAPA capacity shortfalls in 1982. However Article 21(a) applies. PG & E bases its motion on Article 21(a). For purposes of these motions, the Court will proceed as though PG & E had pleaded Article 21(a). PG & E may amend its third counterclaim to correct this error.

for firm load. (*See* Supp. RJN, Ex. 30, Contract 2948A, Art. 21(a).) There appears to be no dispute that PG & E provided WAPA with 2,568,953 kW-mo of capacity for which it is entitled to be paid.

WAPA denies that it owes this amount because it is entitled to offsetting credit for 400 MW of firm Northwest capacity and supporting energy which it supplied to PG & E during the same period. WAPA claims that, in the spring of 1982, PG & E made an oral request to WAPA to purchase 400 MW of firm Northwest capacity, and that this purchase would be used to offset WAPA's purchases of capacity from PG & E. (Anderson Dec. filed 4/3/89 ¶ 6.[23]) WAPA claims that the parties agreed to reduce the terms of their agreement to writing as soon as WAPA reached agreement with BPA to purchase this firm capacity on behalf of PG & E. (*Id.*) WAPA contacted BPA to arrange to make this capacity available to PG & E, and WAPA alleges that the capacity was made available to PG & E starting in May 1982. However, WAPA and BPA did not reduce their agreement to writing until June 1982, by which time the dispute between PG & E and WAPA with respect to energy sales had arisen. Because of the dispute over the Northwest energy sales to the Cities, PG & E refused to enter into a written agreement with respect to Northwest capacity. The oral agreement was never reduced to writing, but WAPA continued to make the 400 MW of capacity available to PG & E.

PG & E does not deny that it made the request nor that it received deliveries of capacity from WAPA during this period. It contends that it is not obligated to pay WAPA for the capacity because (1) the alleged oral agreement is barred by the statute of frauds, (2) WAPA did not provide the five-year notice required by Contract 2948A before PG & E is obligated to give WAPA credit for capacity, (3) WAPA breached Article 12(a)(6) of Contract 2948A by stripping the energy component from

the Northwest capacity for sale to the Cities, and (4) the capacity was not firm.

None of PG & E's contentions has merit. The absence of a written agreement is immaterial; if PG & E received deliveries of capacity at its request, it is obligated to credit WAPA for them. PG & E's reliance on the five-year advance notice provision under Article 19(d)(2) of Contract 2948A is misplaced; that provision applies only to deliveries of capacity that PG & E is required to accept under that Contract, not to deliveries made at PG & E's request. Similarly, PG & E's reliance on Article 12(a)(6) is inconsistent with the facts. The record shows that WAPA imported surplus energy as well as energy associated with capacity and that it was the surplus energy that WAPA sold to NCPA and the Cities. (*See* Anderson Dec. filed 4/3/89, Exhibits, BPA bills to WAPA.) Finally, BPA billed WAPA for capacity at its rate for firm capacity. (*Id.*)

No material factual disputes exist therefore with respect to the firm capacity transactions between WAPA and PG & E from May through September 1982. PG & E is entitled to summary adjudication on its third claim that WAPA owes it for 2,568,953 kW-mo of capacity, and WAPA is entitled to summary adjudication on its Count III that it is entitled to a set-off for the Northwest capacity that it imported on behalf of PG & E.

### C. *Credit for Capacity Imported by WAPA Pursuant to Contractual Notice*

In its Count IV WAPA seeks a declaration that it is entitled to credit under the provisions of Contract 2948A for capacity imported into PG & E's service area starting in 1988. PG & E denies that WAPA has given the notice required by the Contract or that it has otherwise met the conditions of the Contract and contends that WAPA is therefore not entitled to the credit that it claims. Both sides have moved for partial summary judgment on this issue.

---

**23.** John Anderson of WAPA claims to have been present at the negotiations between PG & E and WAPA at which this alleged agreement was made.

The material facts are not disputed. The issue involves the interpretation of Article 19(d) of Contract 2948A, which establishes the conditions under which WAPA is to import and receive credit for Northwest capacity. That article provides in relevant part:

> [WAPA] shall import for use or sale in [PG & E]'s Service Area such capacity and energy as [WAPA] may obtain from sources in the Northwest ... pursuant to power purchase contracts containing provisions for continuity of service satisfactory to [WAPA] and [PG & E].... [PG & E] shall accept all such capacity and energy as follows:
>
> \* \* \* \* \* \*
>
> (2) ... [U]nless changed on not less than 4 years advance notice given by [WAPA] to [PG & E], 400,000 kilowatts of capacity and associated energy.... Such energy shall be furnished in monthly amounts as determined by the parties at least five years in advance of the year in which such capacity is to be made available.

(Supp. RJN, Ex. 30, Contract 2948A, Art. 19(d).) The four-year notice period was changed to five years by agreement of the parties in 1968. (PG & E Ex. 1009, letter agreement.)

Until 1982 WAPA supplied approximately 400 MW of capacity which it purchased from the Centralia Thermal Project in Washington ("Centralia"), and received credit under Article 19(d). (Magaw Aff. filed 2/13/89, ¶ 11.) WAPA's agreement with Centralia expired at the end of 1981 and so the amount of capacity and energy for which WAPA received credit fell to zero at that time. (*Id.*, ¶ 12.) WAPA entered into negotiations with other potential suppliers to replace the Centralia capacity. (*Id.*) On April 15, 1982, WAPA contracted for 150 MW of capacity from Basin Electric Cooperative ("Basin"). (2d Amended Complaint, Ex. H, Contract.)

On April 25, 1983, WAPA sent a letter to PG & E stating that it was "negotiating ... for the purchase of approximately 400 MW of capacity and associated energy." (2d Amended Complaint, Ex. I.) WAPA characterized the letter as "notice to [PG & E] pursuant to Article 19(d)(2) ... of [WAPA]'s intent to purchase up to 400 MW of capacity and associated energy from the Northwest," and requested capacity credit beginning May 1, 1988. (*Id.*) The letter also gave PG & E explicit notice of WAPA's contract with Basin. (*Id.*)

By May 1, 1988, WAPA had entered into three additional contracts: with the City of Tacoma for variable amounts ranging between 41 MW and 74 MW monthly,[24] with the Longview Fibre Company ("LFC") for 45 MW,[25] and with the Portland General Electric Company for 65 MW, with delivery to start in October 1990.[26]

WAPA contends that its April 25, 1983 letter satisfies the notice requirement because that requirement addresses simply the quantity of capacity to be provided, and does not require an executed power purchase agreement to be in effect five years before capacity must be accepted by PG & E under Article 19(d). But, as PG & E points out, Article 19(d)(2) expressly contemplates that the associated "energy shall be furnished in monthly amounts as determined by the parties at least five years in advance of the year in which such capacity is to be made available." Unless a purchase agreement is in effect, this contractual condition cannot be met. WAPA's announcement in 1983 of its "intent to purchase up to 400 MW of capacity" does not meet this condition. Only as agreements

---

**24.** This contract was entered into on August 31, 1983 (Magaw Aff. filed 2/13/89, ¶ 13B), and WAPA sent PG & E a copy of the contract in December 1983 (PG & E Answer, ¶ 33). It was amended in 1984 to increase the firmness of the capacity but without changing the amount supplied. (Magaw Aff. filed 2/13/89, ¶ 16.)

**25.** This contract was entered into on October 31, 1983 (Magaw Aff. filed 2/13/89, ¶ 13C), and WAPA sent PG & E a copy of the contract in November 1983 (PG & E Answer ¶ 34). It was amended in 1986 without changing the amount supplied. (Magaw Aff. filed 2/13/89, ¶ 17.)

**26.** This contract was entered into on August 25, 1987 (Magaw Aff. filed 2/13/89, ¶ 13D), and WAPA sent PG & E a copy of the contract on August 28, 1987 (PG & E Answer ¶ 40).

were made could the parties determine the amounts of monthly deliveries under them.

The obvious purpose of the notice provision is to give PG & E sufficient lead time to determine the capacity it will need to provide with its own resources and to construct sufficient generating capacity or acquire it from other sources. (*See* Supp. RJN, Ex. 30, Contract 2948A, Arts. 19(d)(1), 19(d)(3).) Had PG & E relied on the 1983 notice as a commitment of 400 MW of capacity, it would now be caught substantially short. If the notice provision is to have any value, therefore, it must require the existence of firm purchase agreements. Because PG & E's obligation to grant capacity credit is premised on the giving of such notice, WAPA is entitled to no credit for any capacity purchase agreement until five years after notice of that agreement has been given to PG & E in accordance with Contract 2948A.

■ Only the Basin agreement qualifies under this interpretation. PG & E contends, however, that WAPA is not entitled to credit for that or any of the other agreements because WAPA and PG & E have not agreed on the adequacy of the continuity of service provisions and the amounts and scheduling of the associated energy as required under Article 19(d). It is not disputed that WAPA sent PG & E copies of each purchase agreement soon after each was entered into. Thus, PG & E had the opportunity to raise objections to the continuity of service provisions in any of the agreements, but has not done so or indicated that scheduling might present difficulties that would stand in the way of granting capacity credit. There is no evidence, therefore, that the terms of the purchase agreements were not satisfactory to PG & E or that satisfactory arrangements for scheduling could not have been made. To the contrary, PG & E has been relying on these arrangements in its filings before the California Energy Commission since at least 1984. (Magaw Aff. filed 2/13/89,

¶ 21 and Exs. 6, 7.) WAPA is therefore entitled to capacity credit starting May 1, 1988 for capacity imported under the Basin agreement.

In the case of the Tacoma and LFC agreements, the parties renegotiated certain provisions that increased the reliability of the capacity supplied under them. Because there was no change in the amount of capacity purchased, or any other change that would affect performance under Article 19(d), there is no reason why the five year notice period should be restarted as of the dates of these amendments. WAPA is therefore entitled to credit commencing five years after the date that it first gave PG & E notice of these agreements.

PG & E is entitled to a declaration that it is obligated to accept and grant credit for capacity commencing five years from the date on which it received notice of the making of power purchase contracts qualifying under Article 19(d). Except as specifically granted, the parties' motions for partial summary judgment on this issue are denied.

### D. Recovery for Underbilling of Capacity Sales by PG & E During 1980–87

■ In bills submitted to WAPA for capacity sales between January 1980 and December 1987, PG & E calculated the amount sold according to a formula different from the formula specified in Contract 2948A. There is no dispute that a different formula was applied and that as a result PG & E billed WAPA less than it otherwise would have. In its fifth claim, PG & E seeks recovery of the difference between the amount billed and the amount that would have been billed if the formula specified in Contract 2948A had been applied. PG & E moves for partial summary judgment with respect to the years 1984–87;[27] WAPA moves for partial summary judgment with respect to all years.[28]

---

27. Originally, PG & E moved for partial summary judgment with respect to the years 1980–83 also. It has now withdrawn its motion with respect to these years.

28. SMUD moves to dismiss this claim on the ground that the FERC has primary jurisdiction over the subject matter. This contention is without merit. The claim presents a straight forward question of contract interpretation the

WAPA contends that settlement agreements entered into by the parties on July 18, 1984, June 24, 1985, and March 5, 1987 resolved these claims. (*See* Magaw Aff. filed 2/13/89, Supp. 1.)

In the July 18, 1984 agreement, PG & E and WAPA settled many outstanding disputes over capacity transactions. That agreement provided that

3. ... [T]he following claims shall be fully and completely satisfied, and released and forever discharged by [WAPA] and PGandE:

\* \* \* \* \* \*

B. Any and all purchases of capacity from the capacity account of Contract 2948A by [WAPA] from PGandE for the period January 1, 1980 through December 31, 1983....

(*Id.*, July 18, 1984 letter at ¶ 3.) The parties also expressly waived all unknown claims relating to the subject matter of the agreement. (*Id.*, at ¶ 9.) This agreement disposed of PG & E's claim for the period 1980–83.

The July 18, 1984 agreement also specified a formula for computing the amount of capacity which WAPA would be deemed to have purchased from PG & E during 1984. (*Id.*, at ¶ 6.B.) PG & E billed WAPA in 1984 according to this agreed upon formula. Therefore, its billings for 1984 were not in error and it is not entitled to any adjustments at this time.

The June 24, 1985 and March 5, 1987 agreements only settled disputes over the level of PDC for 1985–87 and disputes over excess capacity sales by WAPA to PG & E. Neither mentions capacity account sales by PG & E to WAPA. Furthermore, both agreements provide that

Except as specifically provided herein, by executing this agreement, neither party waives any legal rights with respect to any issue or dispute between the parties.

(*Id.*, June 24 1985 and March 5, 1987 letters at ¶ 7.) There is therefore no basis for reading into these agreements an intention by the parties to settle other disputes not

referral of which to FERC would not be war-

specifically referred to, including this claim.

WAPA offers extrinsic evidence, consisting of spreadsheets, that it claims indicates that the parties intended the letter agreements to dispose of disputes relating to capacity sales by PG & E to WAPA. (Magaw Aff. filed 2/13/89, Exs. 8, 9.) However, these spreadsheets do not alter the terms of these agreements; they were prepared after the 1985 agreement was made, do not relate to the period covered by the 1987 agreement, and were used in connection with a different agreement. They have not been tied to the two agreements in issue and hence are not entitled to consideration.

Accordingly, under the July 18, 1984 settlement agreement, WAPA is entitled to partial summary judgment on PG & E's fifth claim with respect to the years 1980–84; and PG & E is entitled to partial summary judgment on this claim with respect to the years 1985–87.

E. *Determination of the Long term Value of PDC*

 In its fourth claim, PG & E seeks a declaration that, under Contract 2948A, PDC of CVP remains at 554 MW until otherwise agreed by the parties. WAPA and SMUD oppose this claim, not on the basis of any dispute as to the level of PDC, but on the ground that the provisions of the Contract control how PDC is to be determined. The Contract provides that the level of PDC is to be set by agreement of the parties. In the absence of an agreement, PDC remains at the previously agreed level. (Supp. RJN, Ex. 30, Contract 2948A, Art. 11.)

Thus this claim presents no justiciable case or controversy. PG & E's contention that the parties have been unable to reach agreement does not suffice to create such a controversy. Therefore this claim is dismissed.

IV. CONCLUSION

For the foregoing reasons, the parties' motions are granted and denied as stated above.

ranted. Accordingly, SMUD's motion is denied.

The parties are directed forthwith to submit an appropriate form of final judgment terminating the action.

IT IS SO ORDERED.[29]

29. *Postscript:* It appears from the proceedings before FERC, of which the Court takes judicial notice, that this action is merely the latest battle in a war between PG & E and NCPA that has dragged on for nearly twenty years. (*See Pacific Gas and Elec. Co.,* 46 FERC ¶ 63,030 (Mar. 27, 1989) (Chief Judge's Report to the Commission).) Consumed by hostility and distrust, the parties and their lawyers have allowed themselves to be driven to take completely untenable positions. The resolution of the issues raised in this litigation is perfectly obvious and any rational group of managers would have settled them long ago without resort to this entirely unnecessary litigation. It is hoped that cooler and wiser heads may take control and put an end to this inexcusable waste of private and public resources.