**FLORIDA MUNICIPAL POWER
AGENCY, Plaintiff,**

v.

**FLORIDA POWER & LIGHT
COMPANY, Defendant.**

No. 92–35–CIV–ORL–22C.

United States District Court,
M.D. Florida,
Orlando Division.

Aug. 18, 1999.

Robert A. Jablon, Bonnie S. Blair, Cynthia S. Bogorad, David E. Pomper, Peter J. Hopkins, Jeffrey A. Schwarz, Andrea G. Lonian, Spiegel & McDiarmid, Washington, DC, L. Lee Williams, Jr., Frederick M. Bryant, Williams & Gautier, P.A., Tallahassee, FL, for Florida Municipal Power Agency, plaintiff.

James M. Grippando, Alvin B. Davis, Steel Hector & Davis, LLP, Miami, FL,

David E. Pomper, Peter J. Hopkins, Jeffrey A., Tony Lin, Andrea Lonian, Jeffrey A. Schwarz, Spiegel & McDiarmid, Washington, DC, J.A. Bouknight, Jr., Edward J. Twomey, Steptoe & Johnson, LLP, Washington, DC, for Florida Power and Light Company, defendant.

## ORDER

CONWAY, District Judge.

This cause comes before the Court for consideration of Florida Municipal Power Agency's ("FMPA") Motion for Summary Judgment (Dkt.312) and Florida Power & Light Company's ("FPL") Motion for Summary Judgment (Dkt.301). FMPA contends that FPL has refused to sell it transmission services on a fair basis, in violation of FPL's contractual obligations and in violation of federal and state antitrust laws.

## I. Background Facts[1]

FPL is a utility company that operates throughout most of Southern and Eastern Florida; its service area extends up the east coast of Florida to the Georgia border. FPL sells electricity at wholesale to other utility companies and at retail to ultimate users. FMPA is a municipally-owned agency, established pursuant to state law. It sells electricity and performs other services for its members, who are municipally-owned electric utilities. FMPA was established to enable cities, which own and operate electric systems, to buy affordable and reliable electricity, using FMPA's ability to finance, negotiate for power supply, and coordinate resources. FMPA's members compete with FPL in the provision of low voltage electricity to consumers, and FMPA and FMPA members compete or attempt to compete with FPL in the provision of high voltage electricity to certain distribution systems and to other utilities. Because many of FMPA's power supply resources and many of its member cities are located within the FPL-owned transmission area, FMPA and its members must depend upon FPL for transmission services.

At the commencement of this lawsuit and until 1994, FPL sold transmission service to FMPA on a "point-to-point" basis. Under this system, FPL assessed charges for transmission between pairs of FMPA receipt and delivery points, that is, points at which electricity would be delivered to or from the FPL network. The Federal Energy Regulatory Commission ("FERC") has characterized point-to-point service as "involving designated points of entry into and exit from the transmitting utility's system with a designated amount of transfer capability at each point." (Dkt. 290 at 5). Therefore, FMPA generally had rights to transmission between only one designated resource and one city. It was required to pay a separate duplicative transmission charge if it wanted to supply the city from another power source.

The "point-to-point" service was rendered pursuant to five transmission service agreements ("TSAs") between FPL and FMPA: (1) the St. Lucie Delivery Service Agreement dated June 27, 1983; (2) the Stanton Agreement dated November 25, 1986; (3) the Stanton Tri–City Transmission Agreement dated November 25, 1986; (4) the Restated and Revised Transmission Service Agreement; and (5) the Agreement to Provide Specified Transmission Service dated April 24, 1986. The TSAs have been filed with FERC, which has the exclusive authority under the Federal Power Act to determine power allocations and the reasonableness of wholesale power rates. *Florida Municipal Power Agency v. Florida Power & Light Co.*, 64 F.3d 614, 615 (11th Cir.1995).

FPL, on the other hand, used a transmission network to integrate its generation and purchased power resources. With this

---

1. Unless otherwise stated, the facts are taken from this Court's opinion in *Florida Municipal Power Agency v. Florida Power & Light* *Co.*, 839 F.Supp. 1563, 1565–67 (M.D.Fla. 1993).

system, as the level of electricity use changed during the day, FPL had the ability to use electricity from different power supply sources so that it could serve its customers' needs while maintaining a reasonable price. "Network service allows more flexibility by allowing a transmission customer to use the entire transmission network to provide generation service for specified loads without having to pay multiple charges...." (Dkt. 290 at 6 n. 15). Network service, for example, "involves substantial flexibility in moving power between receipt and delivery points." *Id.* at 6.

FMPA wants to be able to purchase transmission services on FPL's transmission network to integrate its resources in the same way. Specifically, FMPA has requested access to the FPL-owned transmission network for FMPA's Integrated Dispatch and Operations project ("IDO"). FMPA and its members hope to obtain savings from jointly planning and operating their power supply resources. To accomplish this, FMPA does not want to be restricted to buying transmission services on a "point-to-point" basis because an effort to "network" with "point-to-point" would result in multiple transmission charges. However, at the time, FPL refused to sell FMPA transmission on a network basis; therefore, FMPA was not able to implement its IDO project.

During the 1970s and early 1980s, a number of Florida cities, which are now FMPA members, brought legal actions against FPL. The cities filed a lawsuit alleging antitrust and other claims in the Southern District of Florida; they also filed petitions and interventions before the Atomic Energy Commission ("AEC") and its successor, the Nuclear Regulatory Commission ("NRC"). At the same time, FPL was attempting to gain approval for its St. Lucie Unit 2 nuclear plant. The antitrust issues raised by the Department

of Justice ("DOJ") and the NRC Staff were resolved in an amendment to the construction permit issued to FPL for the St. Lucie plant. As a result of the settlement negotiations, FPL agreed to a License Condition which required it to provide certain transmission services to utilities in Florida. In 1989, FMPA sent a letter to FPL formally requesting that FPL sell it network transmission service for its IDO project.[2] (Dkt.314, Att.A). When these negotiations proved unsuccessful, FPMA filed suit in state court in December 1991. FPL removed the case to federal court in January 1992.

FPMA's amended complaint alleges three counts. In Count I, FMPA claims that the various settlement agreements to which FPL was a party and the construction permit, collectively, constitute a contract between FMPA and FPL, and that the contract was breached when FPL refused to provide network transmission service. In Count II, FMPA asserts that FPL violated state antitrust laws. FMPA alleges federal antitrust violations in Count III. Under all three counts, FMPA seeks injunctive relief and damages.

In December 1993, this Court granted summary judgment in favor of FPL, finding that the "filed rate" doctrine precluded FMPA's claims against FPL for refusal to sell FMPA network transmission service. On appeal, the Eleventh Circuit vacated this Court's judgment. It noted that the characterization of FMPA's claims was critical to whether the filed rate doctrine applied. The court held as follows:

> If the gravamen of [FMPA's] claim that the two services are distinct and there is no filed network rate is accurate, then it is clear the doctrine would not confer immunity. The district court improperly concluded in its order on reconsideration that even if network and point-to-point transmission are entirely different services or products, the filed rate doc-

---

**2.** FMPA attempted to negotiate for network services beginning in 1982, but FPL refused

to enter into any agreements.

trine would bar an antitrust claim. There needs to be a factual determination of whether network transmission is such a different product from point-to-point transmission that reasonable rate-making would require the filing of separate network transmission rates.

On remand, this Court stated that its determination of whether the filed rate doctrine applied would be materially facilitated by FERC's informed evaluation of whether point-to-point service and network service were viewed as "entirely different" services such that reasonable ratemaking would have required that a separate rate be filed in 1989. (Dkt.283). Therefore, the Court ordered FMPA to file a petition for a declaratory ruling with FERC, to determine whether:

> the network service FMPA sought in 1989 was such a different product from point-to-point service that reasonable ratemaking would have required the filing of separate network transmission rates.

*Id.*

On November 3, 1998, FERC issued its Order on Petition for Declaratory Order. FERC explained that it could not determine with certainty how it would have decided the question presented in 1989. (Dkt. 290 at 5). However, to provide guidance to the Court, FERC supplied the Court with the evolution of FERC precedent that relates to the issue presented. *Id.* FERC explained that in 1989 the electric industry was under a fundamentally different regulatory scheme with respect to transmission access. *Id.* FERC also explained that unbundled network transmission service was not provided to third parties, and therefore, FERC had little occasion to distinguish network and point-to-point services. *Id.* at 6–7. However, FERC explained that in the late 1980s within the industry, "there was at least some recognition that network and point-to-point services were distinct services." *Id.* at 7.

During the pendency of this action, FERC has ordered FPL to provide network services to FMPA. *Florida Municipal Power Agency v. Florida Power & Light Co.*, 65 FERC ¶ 61,125 at 61,615 (1993) (Dkt.313, App.1), *aff'd in relevant part*, 67 FERC ¶ 61,167 (1994) (Dkt.313, App.2), *clarification granted and reh'g denied*, 74 FERC ¶ 61,006 (1996) (Dkt.313, App.3). These developments have mooted FMPA's request for injunctive relief. Therefore, the remaining issues relate to FMPA's claim for damages. On February 23, 1999, the parties filed cross-motions for summary judgment.

## II. Standard for Summary Judgment

Summary judgment is appropriate only when the Court is satisfied "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). In making this determination, the Court must view all of the evidence in a light most favorable to the non-moving party. *Samples on Behalf of Samples v. Atlanta*, 846 F.2d 1328, 1330 (11th Cir.1988). The moving party has the initial burden of establishing the absence of a genuine issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Next, the "non-moving party ... bears the burden of coming forward with sufficient evidence of every element that he or she must prove." *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 (11th Cir.1987). To that end, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file', designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548.

## III. Filed Rate Doctrine

Notwithstanding the Eleventh Circuit's opinion, FPL argues that FMPA's claims continue to be barred by the filed rate doctrine based on the preexisting con-

tracts between the parties. FPL explains that FMPA did not request transmission service as a separate or distinct service from the point-to-point service already being provided under the filed TSAs, but requested that the existing contracts be modified or abrogated. FPL argues that FMPA is essentially seeking to escape its obligations under the specific filed rate schedules. Therefore, FPL concludes that because FMPA seeks relief from the terms of the rate schedules that were already on file in 1989, FMPA's claims are barred by the filed rate doctrine. In response, FMPA claims that the Eleventh Circuit's mandate precludes FPL's "existing contract" argument.

To address this issue fully, it is necessary to analyze the Eleventh Circuit's opinion and the arguments made before that court. On appeal, FMPA asserted that its damage claim was not barred by the filed rate doctrine because the doctrine does not apply when no rate is filed. *Florida Municipal Power Agency,* 64 F.3d at 616. FMPA argued that while there was a filed rate for point-to-point service, FPL refused to sell network service, which FMPA insisted was distinct from point-to-point. *Id.* For its part, FPL asserted that "network service is nothing more than different pricing of FPL's existing transmission." *Id.* It argued that FMPA's request for network service was actually a request to modify or abrogate the rates on file with FERC. *Id.* FPL contended that this modification was clearly barred by the filed rate doctrine. *Id.*

After summarizing the arguments, the Eleventh Circuit explained that the characterization of FMPA's claim "is critical to whether the filed rate doctrine will apply." *Id.* The appellate court further noted that the "parties do not dispute that if there was a filed rate covering network service, the damage claim would be precluded by the filed rate doctrine." *Id.* Finally, the court concluded:

> If the gravamen of the Agency's claim that the two services are distinct and

there is no filed network rate is accurate, **then it is clear the doctrine would not confer immunity.** The district court improperly concluded ... that even if network and point-to-point transmission are entirely different services or products, the filed rate doctrine would bar an antitrust claim.

*Id.* at 617 (emphasis supplied).

From these statements, it is clear that on remand, the only issue remaining as to the filed rate doctrine is whether network and point-to-point transmission are different products. Although FPL does not specifically address this issue in its memorandum, it apparently concedes that in 1989, the two services were sufficiently distinct that reasonable ratemaking would have required the filing of separate network transmission rates. In its memorandum, FPL refers to the rate schedules for point-to-point and network services as "[t]wo 'distinct' ... rate schedules." (Dkt. 302 at 2). FPL further states as follows:

> Apparently, it is FMPA's position that if "network" and "point-to-point" transmission service can be viewed, in the abstract, as separate or distinct services, that is the end of the matter. That might be so, under the Eleventh Circuit's opinion, if the slate were clean, that is, if there were no existing contracts on file as rate schedules.

*Id.* at 10. Even FPL's expert, Rodney Frame, testified before FERC in 1994 that network and point-to-point services are different services generically. (Dkt. 313, App. 8 at 13, 16). Consequently, because no dispute exists as to whether the services would have been considered different in 1989, the Court finds that the filed rate doctrine does not confer immunity. Holding otherwise would violate the Eleventh Circuit's mandate.

## IV. Statute of Limitations

FPL also argues that the five-year statute of limitations applicable to the contract claim and the four-year limitations period governing the antitrust claims began to

run in 1982, the year FMPA first requested that FPL provide it with network transmission service. Under FPL's theory, FMPA's claims would be time-barred. FMPA responds that the appellate mandate precludes FPL's limitations defense. Even though FPL argued this issue on appeal, the appellate court vacated this Court's opinion. FMPA contends that the Eleventh Circuit would have affirmed this Court's decision had FMPA's claims been barred by the statute of limitations. FMPA also asserts that, in any event, the statute of limitations did not begin to run until 1989, when it requested network service for the IDO project.

■ At the outset, the Court rejects FMPA's argument that the Eleventh Circuit decided that FPL's statute of limitations defense lacked merit. The Eleventh Circuit neither expressly nor implicitly decided that issue. Before a court can address the merits of a party's claims or defenses, it must satisfy itself that it has jurisdiction over those claims. The Eleventh Circuit remanded this case so that this Court could determine whether or not it has jurisdiction over the damage claims; it did not decide whether the statute of limitations had run.

■ In any event, the Court finds that FPL's statute of limitations argument fails as a matter of law. FPL acknowledges that the License Conditions "assure the Cities that FPL will provide transmission service in accordance with the license conditions during the operating life of St. Lucie Unit No. 2." (Dkt. 313, App. 42 at 72). In addition, the License Conditions provide in pertinent part that FPL "shall transmit power ... between or among more than two neighboring entities, or sections of a neighboring entity's system which are geographically separated, with which, now or in the future, [FPL] is interconnected ..." (Dkt. 316, Att A, § X(a)). Therefore, it is clear that FPL had a continuing duty to provide network transmission service. Under Florida law, a long-term continuing contract "can be breached

intermittently during its term." *Klein v. John Hancock Mut. Life Ins. Co.,* 683 F.2d 358, 360 (11th Cir.1982).

Although FMPA began requesting network transmission service in 1982, it was not until 1989 that FPL rejected FMPA's request for service for its IDO project. Although the IDO project required network transmission, the transmission requirements for this project were fundamentally different from earlier projects because the IDO project involved new resources and a new combination of delivery points. Therefore, FPL's refusal to sell network transmission service for the IDO project constituted a new and actionable violation of the contract. *See Singer Co. v. Baltimore Gas and Electric Co.,* 79 Md. App. 461, 558 A.2d 419, 425 (1989) (finding that "where a contract provides for continuing performance over a period of time, each successive breach of that obligation begins the running of the statute of limitations anew, with the result being that accrual occurs continuously and a plaintiff may assert claims for damages occurring within the statutory period of limitations"); *Christmas v. Virgin Islands Water and Power Auth.,* 527 F.Supp. 843, 848 (D.Vi. 1981) (concluding that where a continuing covenant to maintain transmission line exists, a breach of the covenant gives rise to a cause of action each day the breach continues).

■ Similarly, the Court finds that FMPA's antitrust claims are not barred by the statute of limitations. An antitrust cause of action accrues and the limitation period commences each time a defendant commits an act that injures the plaintiff's business. *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971). However, " '[w]hen a continuing antitrust violation is alleged, a cause of action accrues each time a plaintiff is injured by an act of the defendants.' " *DXS, Inc. v. Siemens Medical Systems, Inc.,* 100 F.3d 462, 467 (6th Cir. 1996) (quoting *Barnosky Oils, Inc. v. Un-*

*ion Oil Co. of California,* 665 F.2d 74, 81 (6th Cir.1981)). When a plaintiff alleges a continuing violation, an overt act by the defendant is required to restart the statute of limitations. *Id.* (citations omitted). "[T]wo elements characterize an overt act which will restart the statute of limitations: 1) it must be a new and independent act that is not merely a reaffirmation of a previous act; and 2) it must inflict new and accumulating injury on the plaintiff." *Pace Indus., Inc. v. Three Phoenix Co.,* 813 F.2d 234, 238 (9th Cir.1987). In a continuing refusal to deal situation, if the plaintiff can show that "there had been a specific act or word of refusal (by defendant to deal with plaintiff) during the limitations period," that reiteration would have constituted an injurious act giving rise to an antitrust cause of action. *Poster Exchange, Inc. v. National Screen Serv. Corp.,* 517 F.2d 117, 127–29 (5th Cir.1975), *cert. denied,* 423 U.S. 1054, 96 S.Ct. 784, 46 L.Ed.2d 643 (1976).[3]

In the instant case, the 1989 request for network transmission services constituted an injurious act which renewed the limitations period. FMPA specifically requested service for its IDO project, and FPL specifically rejected the request. *See Columbia Steel Casting Co., Inc. v. Portland General Electric Co.* 111 F.3d 1427, 1444 (9th Cir.1996) (finding that defendant's refusal to wheel another company's electricity to plaintiff's casting plant was an overt act that restarted the statute of limitations), *cert. denied,* —— U.S. ——, 118 S.Ct. 1688, 140 L.Ed.2d 824 (1998).

FPL asserts that when it denied FMPA's request for network transmission service in 1982, "FPL made it perfectly clear that there never would be such a contract at the price demanded by FMPA." (Dkt. 302 at 18). However, because FPL could have accepted FMPA's

requests for network transmission service to implement its IDO project and because new negotiations would have been required to agree on a service agreement for this project, FPL's denial of the request in 1982 was not permanent or final. Moreover, FMPA submits evidence that its negotiators were hopeful that FPL would have a change in attitude in part because its senior leadership had changed. (Dkt. 341, Att. H at 27; Att. L at ¶ 7). For the foregoing reasons, FPL's statute of limitations defense fails.

## V. Breach of Contract

FMPA argues that it is entitled to summary judgment on its claim that FPL breached its contractual obligations to provide FMPA with network transmission service. In this regard, FMPA asserts that it is a third party beneficiary to the settlement agreements in 1980.

As the Court previously noted, in the early 1970s, FPL attempted to obtain a license from the NRC authorizing it to construct a nuclear power plant, St. Lucie Unit 2. Pursuant to the Atomic Energy Act ("AEA"), the NRC could not issue a license if doing so would "create or maintain a situation inconsistent with the antitrust laws." 42 U.S.C. § 2135(c). In 1973, the DOJ advised the NRC that, in its opinion, the issuance of a license could create or maintain a situation inconsistent with antitrust laws.[4] Three years later, the DOJ recommended an antitrust hearing. During their review, the DOJ and the NRC Staff became concerned that FPL's control of the region's transmission facilities, and the restrictions it placed on access to those facilities, would enhance the market power associated with FPL's ownership of large generating units like St. Lucie Unit 2.

---

**3.** The Eleventh Circuit, in an en banc decision, *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

**4.** The principal concerns were FPL's refusal to (1) wheel, (2) interconnect with other power entities, and (3) grant access to the St. Lucie nuclear facility. (Dkt. 313, App. 14; App. 11 at 362).

In September 1980, FPL, the DOJ, and the NRC Staff reached a settlement agreement. The agreement provided, in relevant part, that:

It is hereby stipulated and agreed by and among the United States Department of Justice ("Department"), the Staff of the Nuclear Regulatory Commission ("NRC Staff"), and Florida Power & Light Company ("FPL") as follows:

1... FPL hereby consents to incorporating into the license for St. Lucie Plant, Unit No. 2 the conditions set out in the attached document, entitled "St. Lucie Plant, Unit No. 2—Proposed License Conditions"....

2.... The Department will withdraw its request that the NRC conduct a[n] [antitrust] proceeding against FPL....

4. The parties to this Stipulation will jointly request the [Atomic Safety and Licensing Board] to make these conditions in their entirety effective immediately.... If the motion to make the license conditions in their entirety effective immediately is not granted, FPL may withdraw its agreement to accept these conditions, in which event the Department and the NRC Staff will not be bound by anything herein; if such motion is granted, however, FPL will abide by these conditions and modifications....

(Dkt.316, Att.A).

In their joint motion to the Atomic Safety and Licensing Board to approve and authorize the implementation of the settlement agreement, the parties explained that granting the motion

will assure that, effective immediately, FPL will be committed to deal with other electric utilities in conformance with the conditions. Moreover, granting of the motion will also assure that utilities, including several who have not intervened in this proceeding, which desire to participate in the ownership of St. Lucie Unit No. 2 will be able to exercise that option promptly, and that those utilities which choose to participate will begin to share in the costs and risks of construction without unnecessary delay.

(Dkt. 316, Att. A at 2).

The License Conditions, which were incorporated into the license for the St. Lucie plant and were attached to the settlement agreement, provide in pertinent part that FPL "shall transmit power ... between or among more than two neighboring entities, or sections of a neighboring entity's system which are geographically separated, with which, now or in the future, [FPL] is interconnected ..." (Dkt. 316, Att A, § X(a)). The License Conditions further provide that FPL's

provision of transmission service under this section shall be on the basis which compensates it for its costs of transmission reasonably allocable to the service in accordance with a transmission agreement, transmission tariff or on another mutually agreeable basis. [FPL] shall file such transmission agreements or transmission tariffs with the Federal Energy Regulatory Commission or its successor agency. **In the event that [FPL] and a requesting entity are unable to agree regarding transmission services required to be provided under this section X, [FPL] shall, upon the request of such entity, immediately file a service agreement at the Federal Energy Regulatory Commission or its successor agency providing for such service.**

(Dkt.316, Att.A, § X(b) (emphasis supplied)).[5] The NRC granted the joint motion, thereby triggering FPL's obligations pursuant to the settlement agreement. (App.20).

---

**5.** The joint motion and settlement agreement were signed by counsel for FPL, the DOJ, and the NRC Staff.

■ The Court finds that the settlement agreement, which incorporates the License Conditions, creates a legally enforceable agreement. In a proceeding brought before FERC by the NRC Staff to compel FPL to file certain antitrust license conditions, the Administrative Law Judge ("ALJ") stated as follows:

> The St. Lucie license conditions are a part of and reflect a settlement agreement voluntarily entered into by FPL with the Department of Justice and the NRC Staff. The settlement agreement and license conditions were a *sine qua non* to the grant of the St. Lucie license to FPL. By virtue of the settlement agreement and by accepting the St. Lucie license, FPL agreed to be bound by the terms of the license conditions. Thus, the license conditions and underlying settlement agreement are in the nature of a contract.

*Florida Power & Light Co.*, 26 FERC ¶ 63,019, 65,055 (1984) (Dkt.316, App.21), *vacated as moot after settlement*, 30 FERC ¶ 61,230 (1985) (Dkt.316, App.22). Although this decision is not binding, the Court finds the ALJ's characterization of the settlement agreement and license conditions persuasive. It is clear that FPL agreed to the conditions set forth in the license for the St. Lucie Plant, Unit No. 2 and that, in exchange, the NRC and the DOJ agreed to withdraw their request for an antitrust proceeding and to communicate to the NRC that the conditions would not create a circumstance that violated the antitrust laws. Thus, a binding contract exists.

■ The next issue is whether FMPA is a third party beneficiary to the contract and, if so, whether it can enforce the contract. A person who is not a party to a contract may not sue for breach of that contract where that person receives only an incidental or consequential benefit from the contract. *Caretta Trucking, Inc. v. Cheoy Lee Shipyards, Ltd.*, 647 So.2d 1028, 1030–31 (4th DCA 1994) (citing *Metropolitan Life Ins. Co. v. McCarson*, 467

So.2d 277 (Fla.1985)). "The exception to this rule is where the entity that is not a party to the contract is an intended third party beneficiary of the contract." *Id.* at 1031 (citing *Jacobson v. Heritage Quality Constr. Co.*, 604 So.2d 17 (4th DCA 1992), *dismissed*, 613 So.2d 5 (Fla.1993)). "A party is an intended beneficiary only if the parties to the contract clearly express, or the contract itself expresses, an intent to primarily and directly benefit the third party or a class of persons to which that party claims to belong." *Id.* (citing *Aetna Casualty & Surety Co. v. Jelac Corp.*, 505 So.2d 37 (4th DCA 1987)).

After reviewing the joint motion of the DOJ, the NRC Staff, and FPL, and the License Conditions, the Court concludes that the parties intended to confer a direct and substantial benefit upon FMPA. In the Joint Motion, the parties explain that pursuant to the Conditions, FPL "will be committed to deal with other electric utilities in conformance with the condition." (Dkt.316, Att.A). The License Conditions also list a number of obligations whereby FPL agreed to provide services to neighboring utilities. For instance, FPL agreed to "interconnect at any technically feasible point upon its system" (Dkt. 316, Att. A at § II), to "sell emergency power" (Dkt. 316, Att. A at § III), to "engage in purchases and sales of maintenance power and energy" (Dkt. 316, Att. A. at § IV), to "sell or purchase economy energy" (Dkt. 316, Att. A. at § V), and to "sell firm wholesale power on a full or partial requirements basis" (Dkt. 316, Att. A at § IX). With regard to transmission services, FPL agreed to "transmit power ... between two or among more than two neighboring entities, or sections of a neighboring entity's system which are geographically separated, with which, now or in the future, [FPL] is interconnected." (Dkt. 316, Att. A at § X). A "neighboring entity" is defined as:

> a private or public corporation, governmental agency or authority, municipality, rural electric cooperative, or lawful

association of any of the foregoing, which owns, contractually controls, or operates, or in good faith proposes to own, contractually control, or operate facilities for the generation or transmission of electricity, which meets each of the following criteria: (1) its existing or proposed facilities are actually interconnected or technically feasible of interconnection with those of [FPL]; (2) its existing or proposed facilities are fully or partially within the applicable area; (3) it is, or upon commencement of operations, will be subject to regulation as a public utility with respect to rates or service under applicable state law, or under the Federal Power Act, or it is legally exempted from such regulation by law.

(Dkt. 316, Att. A at § I(c)). The parties do not dispute that FMPA falls within the definition of a "neighboring entity."

■ The parties' contemporaneous characterizations also indicate that FMPA is a third-party beneficiary to the contract. The NRC Staff stated that the License Conditions created "entitlements for coordination and transmission services," for which "FMPA would qualify." (Dkt. 316, Att. D at 11). The DOJ told the NRC that "[t]he conditions confer upon beneficiary systems *immediately* the right to make use of the increased power supply options." (Dkt. 316, Att. C at 3 (emphasis in original)). FPL noted that "[t]he settlement . . . provides other electric systems legal rights in addition to those which they have now." (Dkt. 316, Att. B at 2). These statements demonstrate the parties' intent to create rights in third persons.[6]

■ FPL argues that the DOJ, NRC and Federal Trade Commission settlements of antitrust actions are intended to benefit competition generally and the public interest, and are not entered into for the direct and substantial benefit of private third parties. However, Florida law does not require a contract to have been made solely for the benefit of the third party. In fact, courts have allowed suits involving third party actions arising from public contracts. *See Technicable Video Systems, Inc. v. Americable of Greater Miami, Ltd.*, 479 So.2d 810, 812 (3d DCA 1985). For example, in *Technicable Video Systems*, a city granted a license to the defendant to operate and maintain a cable television system. *Id.* at 811. One provision of that license required the defendant to make reasonable and good faith efforts to use qualified minority business enterprises for 20% of all its contracted expenditures. *Id.* The plaintiff, which was a qualified minority business as defined under the license, sought to provide services to the defendant. *Id.* After negotiations proved futile, the plaintiff brought suit as a third party beneficiary, alleging, *inter alia*, that the defendant had breached the license conditions because it failed to meet the 20% requirement. *Id.* Based on the terms of the license and the nature of plaintiff's request, the court determined that the plaintiff was a third-party beneficiary and, consequently, had standing to pursue a breach of contract claim. *Id.* at 812–13. The court reasoned as follows:

> [T]he license expressly requires a reasonable and good faith effort to include [minority business enterprises] in a specific percentage of the total dollar amount of contracted work. It cannot

---

**6.** The FMPA Cities did not join the settlement, believing that other concessions were necessary. (Dkt. 316, Att. 20 at 2). FPL argues that because FMPA opposed the Stipulation, "they cannot now be heard to claim the benefit of a settlement from which they excluded themselves and actively opposed in 1980." (Dkt. 333 at 10). Even thought FMPA sought additional concessions, it did not ask the NRC to reject the settlement if these concerns were

not addressed. (Dkt. 313, App. 20 at 2). In fact, the Cities argued that if the NRC were to reject their request, it should approve the settlement. *Id.* The Cities position does not preclude them from benefitting from the settlement. To determine whether a party is a third-party beneficiary, courts examine the intent of the parties to the contract and the contract itself.

be seriously doubted that this provision was intended to directly benefit [minority business enterprises]. The fact that the contract as a whole was intended to benefit city residents by providing them with cable T.V. does not negate the lucid expression of an intent to benefit [minority business enterprises] by allowing them a hand in setting up and maintaining the system.

*Id.*[7]

The Court also finds persuasive a similar case arising in California. In *United States ex rel. Western Area Power Administration v. Pacific Gas & Electric Co.,* 714 F.Supp. 1039 (N.D.Cal.1989), the district court held that certain municipal utilities were intended third party beneficiaries to an agreement between the DOJ and a private party. In that case, the DOJ and PG & E entered into an agreement whereby PG & E agreed to accept certain "commitments" as conditions attached to its nuclear power license in exchange for the DOJ's promise to terminate its antitrust investigation. *Id.* at 1043. The commitments generally described PG & E's obligations to provide interconnection, transmission, and power service. *Id.* The municipal utilities brought suit seeking to enforce the commitments. *Id.* at 1044. The court held in pertinent part:

> In addition to being NRC license conditions, the [Commitments] are part of a contract between PG & E and the Department of Justice.... [The municipal utilities] are entitled to sue as third-party beneficiaries of that contract to enforce their rights under that contract.... California law allows a third-party beneficiary claim to be brought by a direct beneficiary of a contract between a private party and the government.... The [Commitments] were made expressly for the benefit of the Neighboring Entities and Distribution Systems in PG & E's service area.... [The municipal utilities] have standing to assert a third-party beneficiary claim in this Court under the Commitments.

*Id.* at 1051.

FPL argues that *PG & E* is distinguishable from the instant case. First, FPL asserts that the plaintiffs in *PG & E* were seeking to enforce the contract, not the applicable license conditions. In *PG & E,* the commitments were contained in the agreement and were conditions attached to PG & E's nuclear power license. *Id.* at 1043. Not only were the commitments NRC license conditions, the district court found them to be part of a contract between PG & E and the DOJ. *Id.* at 1051. Likewise, in the instant case, the License Conditions were part of the contract between FPL and the DOJ and the NRC Staff. Accordingly, PG & E is not distinguishable on this basis.

■ Second, FPL contends that Florida law regarding third-party beneficiary contracts is different from California law. Under California law, a "third party qualifies as a beneficiary under a contract if the parties intended to benefit the third party and the terms of the contract make that intent evident." *Karo v. San Diego Symphony Orchestra Ass'n,* 762 F.2d 819, 821 (9th Cir.1985). The standards under Florida law and California law are not inconsistent. Hence, it does not appear that the outcome of *PG & E* would have been different if decided under Florida law.

■ FPL also contends that the provisions of NRC licenses cannot be the subject of private actions because their enforcement is left entirely to the NRC through the Attorney General. FPL relies on the AEA, which provides that "[n]o action shall be brought against any individ-

---

7. FPL asserts that "third-party beneficiary actions do not provide a 'back door' to avoid mandatory administrative remedies." (Dkt. 333 at 8). In support of this argument, FPL cites to *Technicable Video,* which permitted a third-party beneficiary claim when the ordinance did not provide an exclusive enforcement procedure. As discussed, *infra,* the contract in the instant case did not provide for an exclusive administrative remedy.

ual or person for any violation under this chapter unless and until the Attorney General of the United States has advised the Commission with respect to such action and no such action shall be commenced except by the Attorney General of the United States...." 42 U.S.C. § 2271(c). The court in *PG & E* was also confronted with this issue. In that case, PG & E argued that "even if it violated the [Commitments], [the federal district court] is without jurisdiction to enforce them ... because the Commitments are NRC license conditions [which] can be enforced only by the United States Attorney General after advising the NRC." *Pacific Gas and Electric Co.*, 714 F.Supp. at 1050. The court rejected this argument, concluding that the action was not one to enforce the AEA. *Id.* at 1051. Rather, the court found that NRC license conditions were part of a contract between PG & E and the DOJ and that the utilities were entitled to sue as third-party beneficiaries to enforce their rights under the contract.[8] *Id.* This Court agrees with that reasoning. Because FMPA is suing FPL for breach of contract and not for a violation of the AEA, it has standing to enforce its rights as a third-party beneficiary.[9]

In addition, the License Conditions do not expressly preclude private enforcement. In fact, the License Conditions contemplate that the enforcement actions

would occur before FERC. For example, the Conditions provide that:

> In the event that [FPL] and a requesting entity are unable to agree regarding transmission services required to be provided under this section X, [FPL] shall, upon request of such entity, immediately file a service agreement at the Federal Energy Regulatory Commission or its successor agency providing for such service.

(Dkt.316, Att.A, § X(b)). This provision further undermines FPL's assertion that only the NRC can enforce the NRC licenses.[10]

FPL contends that even if a contract exists, the fact that FMPA subsequently entered into five TSAs with FPL precludes relief. FPL argues that these five point-to-point TSAs are inconsistent with, and therefore abrogate, the earlier agreement. FPL also contends that the TSAs waived FMPA's rights under the License Conditions because FMPA "freely agreed to point-to-point service knowing that such service was inconsistent with network transmission service." (Dkt. 333 at 43). These arguments are without merit.

▮ Pursuant to the License Conditions, FPL is obligated to provide transmission service during the operating life of St. Lucie Unit No. 2. (Dkt.313, App.42).

---

8. In response to a petition seeking NRC action to enforce PG & E's license, the NRC withheld action pending the outcome of, and ultimately relied on, the decision of the district court. *Pacific Gas & Elec. Co. (Diablo Canyon Nuclear Power Plaint, Units 1 and 2),* 31 NRC 595, 596, 601, 603–04 (1990). In that opinion, the NRC did not object to the district court's finding that it had jurisdiction to determine the issues raised.

9. The cases cited by FPL in support of its argument involved attempts by private parties to enforce directly non-contractual regulatory obligations without first exhausting administrative obligations. *See Liesen v. Louisiana Power & Light Co.,* 636 F.2d 94 (5th Cir. Unit A 1981); *Susquehanna Valley Alliance v. Three Mile Island Nuclear Reactor,* 619 F.2d 231 (3d Cir.1980), *cert. denied,* 449 U.S. 1096,

101 S.Ct. 893, 66 L.Ed.2d 824 (1981); *Simmons v. Arkansas Power & Light Co.,* 655 F.2d 131 (8th Cir.1981); *Suffolk County v. Long Island Lighting Co.,* 728 F.2d 52 (2d Cir. 1984); *Graham v. Niagara Mohawk Power Corp.,* 852 F.Supp. 150, 151 (N.D.N.Y.1994).

10. When FMPA petitioned the NRC to begin enforcement proceedings, the Director determined that FERC's Order requiring FPL to provide network transmission service adequately addressed the concerns raised in FMPA's petition. (Dkt. 313, Att. 11 at 368–69). Therefore, the NRC Director determined that no proceeding should be instituted and that no further regulatory action by the NRC was required. *Id.* This decision further supports FMPA's argument that NRC is not the exclusive enforcement mechanism under the AEA.

The License Conditions "set basic rules that FPL must follow in providing transmission service. However, they do not prescribe specific rates or terms and conditions for service. These would be embodied in the contracts between the parties and would be subject to plenary review by FERC." (Dkt. 313, App. 42 at 72 n. 2). Hence, the License Conditions permit FMPA to seek either point-to-point or network transmission service as necessary to implement its specific transmission arrangements. As FERC explained in an order issued January 5, 1996, "the fact that FMPA needs network integration service for some loads and resources does not prevent it from requesting point-to-point transmission for other loads and resources." (Dkt. 313, App.3 at 61,013). From this language, the Court assumes that service agreements for both point-to-point service and network transmission service can simultaneously exist without being inconsistent.

Furthermore, the TSAs do not cover all of FMPA's service requirements.[11] As FPL stated in its Responses and Objections to Plaintiff's Fourth and Fifth Set of Interrogatories, "[e]ach of the existing FERC-filed transmission service contracts between FPL and FMPA is the exclusive, integrated statement of the Parties' agreement regarding the transmission service provided pursuant to such contract." (Dkt. 133, Affidavit of Elise Clare Bjorkan, Exh. 22 at 7). The terms of the TSAs can be changed by filings with FERC by either party. For example, Section 21.1 of the 1990 TSA provides:

*Unilateral Changes and Modifications:* Nothing in this Agreement shall be construed as affecting in any way the right of FPL unilaterally to make application to the FERC for a change in the rates, charges, terms and conditions of service provided in this Agreement, or for termination of such service, pursuant to Section 205 of the Federal Power Act and the rules and regulations of the FERC promulgated thereunder, or the rights of FMPA to make application under Section 206 of the Federal Power Act, provided that, in either case, no application or other request for such change or termination, except for a change in the rates for Transmission Service provided in Appendix E, or the exercise of FPL's rights pursuant to Section 6.3 and 6.4, or a transmission service agreement which supersedes or replaces this Agreement, may be filed earlier than three years after the effective date of this Agreement.

(Dkt. 313, App. 30, Att. A at 61). The language providing that the TSA could be "supersede[d] or replace[d]" at any time was included in anticipation of FMPA's IDO's project.[12] (Dkt. 331 at 42–43).

▨ With respect to the waiver issue, the TSAs expressly reserve FMPA's rights. For example, a section of the TSAs provides that "[n]othing in the Agreement shall be construed as a waiver by FMPA of any of its rights independent of this Agreement." (Dkt. 335, Exh. 1 at 63). Thus, because the TSAs allow additional transmission services and because the terms can be changed or modified under certain circumstances, FPL's argu-

---

11. In support of its argument that the TSAs abrogate FMPA's rights with respect to the License Conditions, FPL relies on *PG & E*. The court in that case held that "[t]o the extent that the Cities obligated themselves to take their full requirements from PG & E in exchange for PG & E's obligation to supply them, they cannot look to the Commitments for an escape clause." *PG & E*, 714 F.Supp. at 1052. This case is distinguishable because no TSA provides for all of the transmission services which FMPA is entitled to obtain.

12. In fact, Dean Gosselin, one of FPL's negotiators, testified that it was his understanding that FMPA wanted this language added to the TSA for the following reason:

[i]n the event that a transmission service arrangement [for the integrated dispatch operation project] was negotiated which included the all-requirements cities, that this agreement would be able to be revised to accommodate such understanding that may have been reached.
(Dkt. 331 at 43).

ments that the TSAs are inconsistent with the License Conditions, or that FMPA waived its right to network transmission by entering into the subsequent agreements are unpersuasive.[13]

■ The next issue is whether the License Conditions required FPL to provide FMPA with network transmission service. As previously stated, the Conditions provide in relevant part:

X. *Transmission Services*

(a) [FPL] shall transmit power ... (2) between two or **among** more than two neighboring entities, or sections of a neighboring entity's system which are geographically separated, with which, now or in the future, [FPL] is interconnected.

(Dkt. 316, Att. A at 24) (emphasis supplied). The dispute between the parties focuses on the meaning of the word "among." FMPA argues that "among" neighboring entities means to provide network transmission service. In contrast, FPL contends that the language in Section X simply required FPL to continue offering transmission service on the same basis as it was already offering it.

■ Under contract law, a court must first examine the natural and plain meaning of a contract. *Key v. Allstate Ins. Co.*, 90 F.3d 1546, 1548–49 (11th Cir. 1996). If the terms are clear and unambiguous, the court should interpret the agreement in accordance with its plain meaning. *Id.* at 1549. An ambiguity does not exist merely because a contract requires interpretation or fails to define a term. *Id.* On the other hand, if the agreement is ambiguous, the court may look beyond the contractual language to examine the intent of the parties in making the agreement. *Id.*

The Court does not find the terms of the contract to be ambiguous. In its primary

jurisdiction referral Order, FERC characterized point-to-point service " 'as involving designated points of entry into and exit from the transmitting utility's system, with a designated amount of transfer capability at each point.' " (Dkt. 313, App. 4 at 61, 739 n. 15 (citation omitted)). In contrast, network service "allows more flexibility by allowing a transmission customer to use the entire transmission network to provide generation service for specified resources and specified loads without having to pay multiple charges for each resource-load pairing." *Id.* The term "between" in the contract is consistent with FERC's definition of point-to-point service, whereas the term "among" is consistent with FERC's description of network transmission service. In addition, FMPA submits the affidavit of Dr. Gordon Taylor, a consultant to the DOJ in preparing the License Conditions, who explains that "systemwide transmission service among all points on a utility's integrated transmission system is also called 'network' transmission service." (Dkt. 313, App. 23 at ¶ 25).

Prior to the License Conditions, the term "among" was used in the industry. For instance, the Atomic Safety and Licensing Board[14] in *In the Matter of Louisiana Power and Light Company* stated that "[t]ransmission 'among' simply means transmission from any member of a coordinating group to any other member of such group" and "for each coordinating group of entities there shall be a single transmission charge." (App. 9 at 733, 744). In that case, the proposed license condition required the applicant only to transmit between pairs of entities, with a separate charge imposed for transmission in each direction. *Id.* at 739–40. The Atomic and Safety Licensing Board rejected this proposal, holding that the "[t]he limitation of 'between two entities' ... is not an adequate provision designed to permit coordi-

---

**13.** For the reasons stated above, FPL's estoppel argument on the contract claim fails as well.

**14.** According to FPL, the Atomic Safety and Licensing Board under AEC's (and later NRC's) structure functioned at a level similar to that of an administrative law judge.

nation (both operation and development) sufficient to overcome a situation inconsistent with the antitrust laws. A change from 'between' to 'among' will correct this deficiency." *Id.* at 733–34. The Board explained that the "among" requirement was "to prevent multiple transmission charges for transmission of a contracted transmission entitlement among a coordinating group of two or more entities." *Id.* at 737.

Based on the language in the contract, FERC's explanation of the difference between point-to-point and network transmission services, and the use of the term "among" in this specialized field, the Court finds that the License Conditions required FPL to provide network transmission service.[15]

■ FMPA correctly asserts that FPL's refusals to provide network transmission service on any terms violated its obligation under § X(a) of the License Conditions as well as its obligation set forth in § X(b), which states:

> In the event that [FPL] and a requesting entity are unable to agree regarding transmission services required to be provided under this section X, [FPL] shall, upon the request of such entity, *immediately file* a service agreement at the Federal Energy Regulatory Commission or its successor agency providing for such service.

(Dkt. 316, Att. A (emphasis supplied)). FPL does not specifically address this argument. The Court interprets this as a concession as to its merit. Accordingly, the issue of contract damages will proceed to trial.

## VI. Antitrust Claims

FMPA asserts that FPL used its transmission monopoly to limit generation competition between itself and FMPA. Specifically, FMPA contends that FPL "owns and controls a monopoly transmission sys-

tem, that network transmission service is 'essential' for FMPA to compete in wholesale power markets, and that FPL refused to sell FMPA network transmission to gain a competitive advantage." (Dkt. 313 at 30). FMPA asserts that it has suffered competitive injury as a result of FPL's refusal to deal.

### A. Essential Facilities Doctrine

■ The essential facilities doctrine deals with a particular variety of refusal to deal. This type of refusal to deal is unlawful because a "monopolist's control of an essential facility (sometimes called a 'bottleneck') can extend monopoly power from one stage of production to another, and from one market into another." *MCI Communications Corp. v. American Telephone and Telegraph Co.*, 708 F.2d 1081, 1132 (7th Cir.1983), *cert. denied,* 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983). Consequently, companies that control an essential facility must make the facility available on non-discriminatory terms. *Id.* (citing *United States v. Terminal Railroad Association,* 224 U.S. 383, 410–11, 32 S.Ct. 507, 56 L.Ed. 810 (1912) and *Byars v. Bluff City News Co.,* 609 F.2d 843, 856 (6th Cir.1979)).

■ Liability under this doctrine depends on proof of the following elements: "(1) control of the essential facility by a monopolist; (2) a competitor's inability practically or reasonably to duplicate the essential facility; (3) the denial of the use of the facility to a competitor; and (4) the feasibility of providing the facility." *Id.* at 1132–33. Applied to the instant case, the parties agree that it would not be practical or reasonable for FMPA to duplicate FPL's facility and that FPL's transmission system is a natural monopoly.

■ A facility is essential only if "control of the facility carries with it the power

---

**15.** Because the Court finds that the contract language is not ambiguous, there is no need to examine the affidavits of Taylor and Gard-

ner since they relate to the intent of the parties in making the agreement.

to eliminate competition in the downstream market." *City of Anaheim v. Southern California Edison Co.*, 955 F.2d 1373, 1380 n. 5 (9th Cir.1992) (citing *Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 544 (9th Cir.1991), *cert. denied*, 503 U.S. 977, 112 S.Ct. 1603, 118 L.Ed.2d 316 (1992)). At a minimum, a plaintiff must demonstrate that denial of the use of the facility " 'inflicts a severe handicap on potential [or current] market entrants.' " *Twin Laboratories, Inc. v. Weider Health & Fitness*, 900 F.2d 566, 568 (2d Cir.1990) (quoting *Hecht v. Pro-Football, Inc.*, 570 F.2d 982, 992 (D.C.Cir. 1977), *cert. denied*, 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121 (1978)).

FMPA contends that FPL's transmission network is an essential facility because FMPA needs access to this network to serve the electrical requirements of its member-customers, to implement FMPA's IDO project, and to coordinate its generation on a least-cost basis. In support of its position, FMPA primarily relies on FERC's decisions. In FERC's order directing FPL to provide network transmission service to FMPA to support its IDO project, FERC held as follows:

> The Commission finds that ordering network transmission service will be in the public interest in this case. . . . As a general matter, the availability of transmission service (or increased flexibility to use transmission) will enhance competition in the market for power supplies over the long run because it will increase both the power supply options available to transmission customers (thereby benefitting their customers) and the sales options available to sellers. . . . Thus, it is in the public interest for FMPA and its members to have the opportunity to achieve greater efficiency and ratepayer savings.

(Dkt. 313, App. 1 at 61,615). Additionally, FERC concluded in its open-access transmission rulemaking that:

> unduly discriminatory and anticompetitive practices exist today in the electric industry and, more importantly, that such practices will increase as competitive pressures continue to grow in the industry. . . . It is in the economic self-interest of transmission monopolists . . . to deny transmission or offer transmission on a basis that is inferior to that which they provide themselves. The inherent characteristics of monopolists make it inevitable that they will act in their own self-interest to the detriment of others by refusing transmission and/or providing inferior transmission to competitors in the bulk power markets to favor their own generation. . . .

(Dkt. 313, App. 33 at 31,682). In that order, FERC stated that the "only effective remedy is nondiscriminatory open access transmission." *Id.* at 31,683.

Based on these decisions, FMPA asserts that "FERC's decision to require all FERC-jurisdictional utilities to provide network transmission service, in order to eliminate anticompetitive and discriminatory practices in the wholesale electric industry, establishes definitely that network transmission service, including particularly network transmission service on FPL's system, is essential to competition in wholesale power market." (Dkt. 313 at 33). However, FERC's findings are not dispositive of this issue. In its open-access transmission rulemaking, FERC specifically stated that it disagreed with the argument that it is limited to applying a traditional antitrust analysis in determining whether market power exists in the transmission system. FERC further explained that:

> [w]hile we must take antitrust concerns into consideration in exercising our responsibilities under the FPA, we are not an antitrust court, and our responsibilities are not those of the Department of Justice. We have analyzed the incentives and practices of monopoly transmission owners and controllers in light of the statutory standards and directives of the FPA and, based on our findings,

have properly concluded that there is a generic problem that must be remedied. (Dkt. 313, App. 33 at 31,683). Therefore, an independent antitrust analysis is necessary.

FMPA nevertheless contends that access to FPL's transmission system on a network service basis is essential. In support, FMPA submits evidence suggesting that it cannot implement its IDO project without this access. For example, FPL's expert, Rodney Frame, testified that FMPA needs "a transmission service to be able to market the product that it seeks to market." (Dkt. 325 at 114). In addition, another witness, William Schoneck, agreed that in order for FMPA to implement the IDO proposal it is necessary for it to have access to the FPL-owned transmission system. (Dkt. 320 at 223). However, this evidence is insufficient to show that access to FPL's system on a network basis is essential for competition. In other words, the issue is whether there were other options available to FMPA. For instance, in his deposition, Frame observed that the use of FPL's transmission system on the terms and conditions proposed by FMPA is not an essential facility. (Dkt. 325 at 227–28). He further explained that the cheapest way for FMPA to implement the IDO project "in legitimate fashion would be to pick up on some of the transmission offers that Florida Power and Light has made to them or build on the existing arrangements. . . ." *Id.* at 229. Even FMPA argued before FERC that in the past, network service was desirable, but not essential to earlier projects. (Dkt. 313, App. 1 at 61,601). FMPA implied that the access to the network service did not become "essential" until it developed its IDO project. *Id.* In order to prevail, FMPA must show more than inconvenience or some economic loss; it must show that an alternative to the facility was not feasible. *See Twin Lab. v. Weider Health & Fitness,* 900 F.2d 566, 570 (2d Cir.1990). FMPA has not met this burden.

■ There is also a genuine dispute as to whether FPL ever denied FMPA access to its transmission system. FMPA argues that FPL's refusal to provide network transmission service denied it the use of an essential facility. However, FPL continuously provided FMPA with access to its transmission system pursuant to the terms of the TSAs. Whether FPL was required under this doctrine to provide access to its network service is a question for the trier of fact.

*B. Leveraging*

■ FMPA also asserts that FPL's refusal to provide network services constitutes a violation of § 2 of the Sherman Act independent of the essential facilities doctrine. FMPA contends that FPL unlawfully sought to leverage its monopoly power in the market for transmission services into a monopoly position in the market for the sale of bulk electricity. " '[T]he offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market, and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.' " *Eastman Kodak Co. v. Image Technical Serv., Inc.,* 504 U.S. 451, 481, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) (quoting *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966)).

■ The first issue is whether monopoly power exists. In making this determination, it is necessary to define the relevant product market. The relevant market is the field in which meaningful competition is said to exist. *Image Technical Serv., Inc. v. Eastman Kodak,* 125 F.3d 1195, 1202 (9th Cir.1997) (citing *United States v. Continental Can Co.,* 378 U.S. 441, 449, 84 S.Ct. 1738, 12 L.Ed.2d 953 (1964)), *cert. denied,* 118 S.Ct. 1560 (1998). "Defining a relevant product market is primarily 'a process of describing those

groups of producers which, because of the similarity of their products, have the ability—actual or potential—to take significant amounts of business away from each other.'" *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 995 (11th Cir.1993) (citing *General Indus. Corp. v. Hartz Mountain Corp.*, 810 F.2d 795, 805 (8th Cir.1987)) (citation and internal quotations omitted), *cert. denied*, 512 U.S. 1221, 114 S.Ct. 2710, 129 L.Ed.2d 837 (1994). "The reasonable interchangeability of use or the cross-elasticity of demand between a product and its substitutes constitutes the outer boundaries of a product market for antitrust purposes." *Id.* (citing *Brown Shoe Co. v. United States*, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962)).

In the instant case, FMPA asserts that the relevant market is the market for transmission service. Because transmission and generation are sold separately, FMPA contends that these two products constitute separate product markets for antitrust purposes. FPL responds that transmission service cannot be the relevant market because FPL and FMPA do not compete against one another in that market. Instead, FPL asserts that the relevant product market consists of "[f]irm bulk power to supply the needs of the entities in the IDO East that would have been participants in the IDO East project." (Dkt. 334, Affidavit of Frame, 73). FPL states that "[n]ot only is this the *only* market in which FMPA contends that FPL's conduct has had an effect, but this is the only market in which FMPA and FPL actually compete against one another." (Dkt. 333 at 28). Based on the evidence presented, a genuine issue of material fact exists as to whether the relevant product market is transmission or bulk electricity sales.

 Similarly, FMPA has failed to meet its burden of demonstrating that FPL unlawfully sought to leverage its monopoly power in the market for transmission service into a monopoly position in the market for the sale of bulk electricity.

Monopoly leveraging is the use of monopoly power in one market to acquire a monopoly in another market. The Supreme Court held in *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993), that " § 2 makes the conduct of a single firm unlawful only when it actually monopolizes or dangerously threatens to do so." *Id.* at 459, 113 S.Ct. 884. In other words, "to have a dangerous probability of successfully monopolizing a market the defendant must be close to achieving monopoly power." *U.S. Anchor Mfg., Inc.*, 7 F.3d at 994. Monopoly power is defined as " 'the power to raise prices to supra-competitive levels or ... the power to exclude competition in the relevant market either by restricting entry of new competitors or by driving existing competitors out of the market.'" *Id.* (quoting *American Key Corp. v. Cole Nat'l Corp.*, 762 F.2d 1569, 1581 (11th Cir.1985)). To measure monopoly power, courts normally quantify the degree of concentration in a relevant market or the extent of a particular company's ability to control productive capacity in that market. *Id.*

Although FMPA submits evidence demonstrating that FPL has a 80% market share of the transmission market, it fails to present any evidence establishing FPL's market share for bulk power sales. In fact, FPL submits evidence that in 1991, wholesale customers that were potential customers of FMPA obtained only 9.7% of their capacity and 11.5% of their bulk power from FPL. (Dkt. 334, Deposition of Frame, 120–21). Therefore, assuming the relevant market is the market for bulk electricity sales, genuine issues of material fact exist as to whether FPL actually monopolized or dangerously threatened to monopolize that market.

FPL asserts that even if FMPA can establish an antitrust violation, it had legitimate business justifications for refusing to deal. The Supreme Court recognized in *Eastman Kodak Co.* that a monopolist may refuse to deal with its competitors "if there are legitimate competitive reasons for the

refusal." 504 U.S. at 483 n. 32, 112 S.Ct. 2072. FPL asserts that it was justified in refusing to deal because: (1) providing network transmission service would have required FPL to tear up existing agreements; and (2) FMPA requested network transmission service on terms that were unreasonable and unprofitable to FPL. However, as previously discussed, the Court has determined that FPL was required to provide network transmission service pursuant to the License Conditions. The issue of whether FPL's reasons for denying service in the antitrust context were legitimate is a question for the trier of fact.[16]

### C. Other Antitrust Claims

In its motion for summary judgment, FPL argues that FMPA cannot establish that it violated the antitrust laws by refusing to permit FMPA to become a joint owner of FPL's transmission system, by attempting to monopolize, by refusing to sell it a "block" of wholesale power, and by tying sales of high voltage power and coordination services to sales of transmission service. FMPA has not responded to these arguments. The Court interprets this as a concession of FMPA's part. Therefore, summary judgment is due to be granted as to these claims.

### VII. Conclusion

Based on the foregoing, it is ORDERED as follows:

1. Defendant Florida Power & Light's Renewed Motion for Summary Judgment (Dkt.301), filed February 23, 1999, is GRANTED IN PART and DENIED IN PART.

The motion is GRANTED insofar as it seeks summary judgment on FMPA's claims that FPL violated the antitrust laws by refusing to permit FMPA to become a joint owner of FPL's transmission system, by attempting to monopolize, by refusing to sell FMPA a "block" of wholesale pow-

er, and by tying sales of high voltage power and coordination services to sales of transmission service.

In all other respects, the motion is DENIED.

2. Plaintiff Florida Municipal Power Agency's Motion for Summary Judgment (Dkt.313), filed February 23, 1999, is GRANTED IN PART and DENIED IN PART.

The motion is GRANTED insofar as it seeks summary judgment with respect to its breach of contract claim.

In all other respects, the motion is DENIED.

3. This case will proceed to trial on Plaintiff's monopolization claims brought pursuant to § 2 of the Sherman Act and Chapter 542, Fla.Stat. and on damages for Plaintiff's breach of contract claim.

4. Plaintiff Florida Municipal Power Agency's Motion to Strike or In the Alternative Reply Memorandum in Opposition to Florida Power & Light Company's New Summary Judgment Arguments (Dkt.350), filed August 5, 1999, is DENIED. Defendant's Response was not a cross motion for summary judgment, but merely a response to Plaintiff's arguments. In addition, the reply was filed more than three months after the responses were filed.

5. FPL's Motion to Strike FMPA's Motion to Strike or in the Alternative Reply to FPL's March 23, 1999 Memorandum in Opposition to FMPA's Motion for Summary Judgment (Dkt.354), filed August 16, 1999, is DENIED as moot.

**DONE** and **ORDERED.**

---

**16.** FPL's estoppel defense also remains for resolution at trial.